RAILROAD COMMISSION of Texas et al.,
Appellants,

v.

ALUMINUM COMPANY OF AMERICA
et al., Appellees.

No. 11098.

Court of Civil Appeals of Texas.

Austin.

May 29, 1963.

Rehearing Denied June 26, 1963.

Waggoner Carr, Atty. Gen., Joseph Trimble and Linward Shivers, Asst. Attys. Gen., Austin, Wm. H. Darden, Corpus Christi, Hart & Hart, Austin, William E. York, McAllen, Harry S. Pollard, Austin, Lee Jones, Jr., San Antonio, Miller B. Walker, Jr., Nick C. Nichols, Charles F. Cockrell, Jr., and Levert J. Able, Houston, Wallace H. Scott, Jr., and Houghton Brownlee, Jr., Austin, for appellants.

Vinson, Elkins, Weems & Searls, James E. Allison, Jr., Houston, Clark, Thomas, Harris, Denius & Winters, James H. Keahey, Austin, Charles F. Heidrick, Edwin M. Cage, Dallas, for appellees.

PHILLIPS, Justice.

This is an appeal from the judgment of the District Court setting aside an order of the Railroad Commission of Texas dated April 24, 1961 allocating the allowable production of gas and oil in the Appling Field, in Calhoun and Jackson Counties, Texas, and enjoining the Railroad Commission and its members from enforcing the order.

The order under attack, prorates gas on a ⅓ per well, ⅔ acreage basis and the oil on a 50 percent well, 50 percent acreage basis.[1]

1. The proration formula for the Commission's order of April 24, 1961 is as follows:
"RULE 4: The daily total field oil allowable, as fixed by the Commission after deductions have been made for marginal wells, high gas-oil ratio wells and wells which are incapable of producing their allowables as determined hereby, shall be distributed among the remaining producing wells in the field on the following basis:
"(a) The daily acreage allowable for each well, after said deductions have been made shall be that proportion of fifty (50) per cent of the daily field allowable which the acreage assigned to the well bears to the remaining acreage assigned to all the wells in the field.

"(b) The daily per well allowable for each well, after said deductions have been made shall be determined by dividing fifty (50) per cent of the total field daily allowable by the number of producing wells in the field.
"(c) The total daily oil allowable for each well shall be the sum of its per well and acreage allowables.
"RULE 5: The daily allowable production of gas from individual wells completed in a non-associated gas reservoir of the subject field shall be determined by allocating the allowable production after deductions have been made for wells which are incapable of producing their gas allowables, among the individual wells in the following manner:
"(a) Two-thirds (⅔) of the allowed gas production from a non-associated gas

The suit was filed in April of 1961 by the Aluminum Company of America, Crown Central Petroleum Corporation and Carl E. Siegesmund against the Railroad Commission of Texas and its members.

Later in April, 1961, Sun Oil Company intervened adopting for all practical purposes the allegations in the petition filed by the plaintiffs.

Thereafter petitions in intervention were filed on behalf of the following persons who aligned themselves with the Railroad Commission in defense of the above mentioned order: Tex-Star Oil and Gas Corporation, Coastal States Gas Producing Company, Claire Benz-Stoddard, Woods Exploration and Producing Company, Inc., David Davidson, Karankawa Producing Company, Navidad Oil Corporation, Yuhl Oil and Gas Company, Ernestine B. Foyles, Audrey Kjorlaug, Thelma V. Bass, Trustee, Mrs. Nora L. Krueger, Charles L. Krueger, Don Culwell, Mrs. Opal B. Williams, Allen Lester, Rosemary Lester, Clifford B. Reneger, John Alexander, Individually and as Trustee, Robert L. Alexander, Thomas P. Alexander, Judd Alexander, J. E. Alexander, and Dr. G. J. Hayes, Southeastern Pipe Line Company, Joe Blalack and Herbert L. Dillon, Jr.

Plaintiffs filed a motion to strike the intervention of the Southeastern Pipe Line Company which was granted.

Plaintiffs filed a motion to strike defendants' and intervenors' pleas of laches, waiver, estoppel and limitation.

The defendants and defendant-intervenors filed a motion for summary judgment urging, principally, that as a matter of law the plaintiffs and Sun Oil Company were barred by unreasonable delay, laches and estoppel from seeking to cancel the allocation formula of the Railroad Commission.

The case came to trial in September of 1962 whereupon the court overruled the motion for summary judgment of the defendants and defendant-intervenors, granted the motion of the plaintiffs to strike defendants' and defendant-intervenors' pleas of laches, waiver, estoppel and limitation, to which order the Railroad Commission and defendant-intervenors excepted.

The court also, over the objection of the Railroad Commission and defendant-intervenors, entered an order refusing a trial by jury.

The court then proceeded to hear evidence from September 12, 1962, until October 1, 1962. Thereafter on October 9, 1962, the court entered judgment that the order of the Railroad Commission was without substantial evidence, should be declared null and void and enjoined the Commission from enforcing it. The Railroad Commission and certain defendant-intervenors have appealed to this Court.[2]

We hold that the judgment of the trial court is correct.

The parties will be designated here as they were in the Trial Court.

reservoir shall be allocated to the individual wells completed therein in that proportion that the acreage assigned to each such well bears to the sum of the acreage in the reservoir.

"(b) One-third ($\frac{1}{3}$) of the allowed gas production from a non-associated gas reservoir shall be allocated equally among the individual wells completed therein.

"(c) The total daily non-associated gas allowable for each well shall be the sum of its acreage and per well allowables."

2. Not all defendants appealed. Appellants include: Coastal States Gas Producing Co.; Claire Benz-Stoddard; Karankawa Producing Company; Navidad Oil Corporation; Edgar B. Yuhl, dba Yuhl Oil and Gas Co.; Ernestine B. Foyles; Audrey Kjorlaug; Thelma V. Bass, Trustee; Mrs. Nora L. Krueger; Charles L. Krueger; Don Culwell; Mrs. Opal B. Williams; Allen and Rosemary Lester; Clifford B. Renegar; John Alexander, Ind. and as Trustee; Robert L. Alexander; Thomas P. Alexander; J. E. Alexander; Dr. G. J. Hayes; Tex-Star Oil and Gas Corporation; H. L. Dillon, Jr.; Woods Exploration and Producing Co., Inc.; Southeastern Pipeline Co.; Railroad Commission of Texas.

Plaintiffs contend that the defendant-intervenors own ½ of 1% of the acreage in the field which amounts to some 25 acres. That in spite of such a small percentage of ownership they are allowed by the order under attack to produce 20% of the gas and condensate. That the plaintiffs own more than 90% of the acreage in the field which consists of approximately 4000 acres. That if the order here attacked continues through the life of the field, defendant-intervenors and other owners of town lot wells will produce in the future gas and condensate having a present value of more than $8,800,-000 from beneath plaintiffs' leases in the 9 gas reservoirs in Fault Segment "A", in which both large tract and small tract wells were completed at the time of the Commission's order. That the 57 town lot or small tract wells belonging to defendant-intervenors have been confiscating enormous quantities of gas and condensate from plaintiffs' wells and that such confiscation will continue until the field is exhausted unless this Court holds that the Commission's order of April 24, 1961 is invalid and the Commission is instructed to write an order which will be fair and just and protect the correlative rights of the owners and operators in the field.

Plaintiffs cite the case of Atlantic Refining Company v. Railroad Commission, often referred to as the Normanna Case, 162 Tex. 274, 346 S.W.2d 801 (1961) for the proposition that:

"The responsibility rests with the Commission to devise some rule of proration which will conserve the gas in the field in question and at the same time be fair and just to all parties without depriving any of them of his property."

In the Normanna Case, referred to above, the Court struck down a ⅓–⅔ gas proration formula where the facts disclosed that the owner of a .3 acre tract was draining a substantial amount of gas from the adjoining tracts under the abovementioned formula. The Court said:

"Viewing all the facts in the light of the substantial evidence rule, we think the ⅓–⅔ proration formula is an unreasonable basis upon which to prorate the gas production from this reservoir. It does not come close to compelling ratable production; neither does it afford each producer in the field an opportunity to produce his fair share of the gas from the reservoir."

The same result was reached in Halbouty v. Railroad Commission, Tex., 357 S.W.2d 364.

We hold that the case at bar is controlled by the decisions in the Normanna and Halbouty cases.

■ The order before this Court through its proration formula allows the defendant-intervenors and other small tract operators to confiscate unreasonable quantities of minerals underlying the adjoining land of the plaintiffs, is not supported by substantial evidence and is void. Hawkins v. Texas Company, 146 Tex. 511, 209 S.W.2d 338.

The Appling Field was discovered in 1953. The field consists of an extremely complicated multi-zone reservoir principally producing gas with a few relatively unimportant oil reservoirs interspersed in the field. Because these various zones which are separated vertically are broken into separate fault blocks or segments, there are thirty-eight separately prorated gas reservoirs and fourteen separately prorated oil reservoirs in this field. The field operated under statewide rules (25% of open flow potential, regardless of the size of the tract) until June of 1956, when the first special field rules were made applicable to the Middle Kopnicky Sand, Fault Segments A, B and C. The Middle Kopnicky Sand is the deepest producing zone and by far the thickest and most prolific producer and contains more than 80% of the field's gas and condensate reserves. The remaining nine field sands are progressively higher than and overlie the producing area of the Middle Kopnicky Sand. These sands are thin-

ner and less prolific, but all are blanket sands within Fault Segment "A".

Besides the major fault which limits Fault Segment "A" on the East in all reservoirs here involved, there are numerous smaller faults crossing Fault Segment "A" of sufficient size to separate the upper sands into separate fault segments or reservoirs but these faults are not of sufficient magnitude to separate the Middle Kopnicky Sand into separate reservoirs. There are 13 such fault segments within Fault Segment "A". The April 24, 1961, order here under attack, promulgated rules for 52 oil and gas reservoirs, of which 38 are Fault Segment "A".

Four wells were drilled in 1956 on small tracts in the Port Alto and Karankawa Beach townsite areas. In 1956 plaintiffs sought field rules and urged the Commission to adopt a proration formula on the basis of 100% acreage, that is, that each landowner be allowed to produce only those reserves underlying his land. The Commission denied this request and imposed instead a $1/3$–$2/3$ gas allocation formula. Thereafter the rules promulgated by the Commission in the various reservoirs contained allocation formulas on the basis of $1/3$–$2/3$ for gas and 50–50 for oil.

Following the original four wells drilled on the small tracts in 1956, more wells were drilled on town lots in the succeeding years, most of these being multiple completions. After 19 such wells had been drilled plaintiff Aluminum Company of America and others asked for field rules allowing a $1/3$–$2/3$ and 50–50 allocation formula for the first completion; however, they also sought a 100% acreage allocation formula for any subsequent completions in other reservoirs. At a hearing held in March of 1960, plaintiffs made this request of the Commission suggesting that such a formula would protect the correlative rights of the large tract owners and operators as well as those of the small tract owners and operators. Plaintiff Sun has consistently maintained that the field should be prorated on a 100% acreage basis. A total of 38 small tract wells have been drilled since plaintiffs first complained of the blanket application of the proration formula under attack making 57 small tract completions in all.

Plaintiffs own approximately 3702 of the 4288 productive acres in the Middle Kopnicky "A" and as of January 1961, had 22 completions therein. At the same time intervenor-defendants and others had 30 completions in the Middle Kopnicky "A" on town lots with a total assigned acreage of 24 acres. Most of these wells are multiple completed, that is, completed in more than one reservoir.

Following the abovementioned hearing in March of 1960, the Commission considered the matter for almost a year. In February 1961, the Commission's Chief Engineer advised the plaintiffs that the Commission at a formal conference had adopted the field rules containing the allocation formula here under attack. Since the field rules had already gone into effect, plaintiffs filed this suit on April 3, 1961. On April 24, 1961, the Commission issued the formal order here under attack.

A summary of the evidence plaintiffs adduced at the trial is as follows: Under the allocation formula before this Court the average per acre allowable of small tracts is 55 times the average per acre allowable for large tracts and ranges from 43 times as much per acre in the Middle Kopnicky Sand to 154 times in Fault Segment 5 Lower 7600′ sand. This discrimination in favor of small tracts over large tracts exists in each of the nine reservoirs. In the nine reservoirs, the defendant-intervenors and other small tract operators own 0.6645% of the total gas in place, yet they are allowed to produce 19.-5667% of the gas withdrawn, or 29 times their share of reserves. In every case, more than 96% of the town lot production will be drained from others and in all but one reservoir, more than 80% of the town lot production will be drained from the plaintiffs. In the Middle Kopnicky "A" sand alone, containing more than 80% of

the field gas and condensate reserves, 96.-05% of the town lot (defendant-intervenors and others) production will be drained from others, 84.44% will be drained from plaintiffs. That the value of the drainage from plaintiffs will be in the neighborhood of $9,000,000 for the life of the field if the present allocation formula is allowed to stand.

The evidence presented by the plaintiffs before the Trial Court as to the damage they have already sustained by virtue of the allocation formula in question and the damage that they will sustain in the future if the formula is sustained is largely uncontradicted.

Defendant-intervenors and the Railroad Commission defend the order and the allocation formula therein on the theory of laches, waiver and estoppel in that plaintiffs are barred from attacking the allocation formula of the order in question by virtue of the fact that since the first field rules were promulgated in 1956, plaintiffs have at the various hearings held either proposed a formula such as the one before this Court, or acquiesced in it. That the court erred in refusing the Commission and other defendants a jury trial because the evidence raises issues of fact relating to the defenses of unreasonable delay, laches and estoppel. That there were no fair offers on the part of plaintiffs to pool or unitize. That the order before this Court is reasonably supported by substantial evidence. That the Trial Court erred in sustaining plaintiffs' motion to strike a plea of the four year statute of limitations.

A further defense of the order is based on the contention that while the Railroad Commission has no power to enforce the antitrust laws of the State of Texas, it has the right to consider a statutory expression of the policy of the State as respects antitrust violations. That the Commission, by promulgating the allocation formula here under attack, prevents the furtherance of a conspiracy by the plaintiffs to restrict production and eliminate the competition of the small tract operators.

It is also contended that the Trial Court erred in striking the intervention of the Southeastern Pipe Line Company because this intervenor owned a pipe line that had been constructed for the sole purpose of enabling the small tract operators to produce and sell the gas from their wells.

The evidence presented by defendants in support of their theory of waiver, laches and estoppel was the introduction of some eight orders of the Railroad Commission from the time that the first hearing was held in 1956 through an order dated March 1, 1960. All of these orders which were in effect special field rules dealing with the various producing segments of the Appling Field contained a $\frac{1}{3}$–$\frac{2}{3}$, 50–50 allocation formula.

Defendants further presented evidence from the various hearings held to the effect that plaintiffs either proposed or acquiesced in said formula.

At a hearing held February 27, 1957, with reference to the adoption of field rules for the Upper Kopnicky Gas Sand defendants contend that the attorney for the Aluminum Company of America stated to the Commission that he would recommend the above-mentioned formula which would be in keeping with the Middle Kopnicky Gas Sand rules previously adopted. This attorney was quoted as saying:

> "Anyway, we believe that the rules we have recommended are fair and equitable and they will not require the drilling of any unnecessary wells."

Defendants further contend that at a hearing held on July 9, 1957, with reference to the adoption of field rules for the Broughton Sand, Fault Segment No. 6, the attorney for Aluminum Company of America recommended to the Railroad Commission that field rules be adopted which would be the same rules as those in effect for the Appling (Upper Kopnicky Gas) Field and rec-

ommended the abovementioned allocation formula.

That at a hearing held February 18, 1958, relating to four other separate reservoirs in the field, the attorney for Crown Central Petroleum Corporation recommended that as to these reservoirs the Commission adopt the same allocation formula previously adopted for application to other reservoirs. In this connection he said:

"While Crown Central is and has been generally in favor of 100% acreage allocation formula, in view of the fact that the Commission has set a precedent in numerous fault segments and in numerous reservoirs in the Appling Field, we will recommend that that precedent be followed, and that a ⅔ acreage-⅓ per well allocation formula be adopted."

It is contended that at this same hearing the representative of the Aluminum Company in effect concurred with the recommendation made by Crown Central Petroleum Corporation:

"The Aluminum Company of America has interests in various leases within the limits of the scope of this hearing and is in agreement with Crown Central Petroleum Corporation's request. We favor an allocation formula based on 100% acreage, but in line with all the previous rules which the Commission has adopted in this area, and since the Railroad Commission has set this pattern, we will abide with the ⅓ per well-⅔ acreage allocation formula."

Defendants point out that with the exception of the order of January 30, 1961, there were no motions for rehearing on the abovementioned orders and no other appeals to the courts have been taken for any of the allocation orders of the Railroad Commission concerning the Appling Field.

Defendants contend further that beginning in 1959, the plaintiffs started attacking the drilling permits granted by the Railroad Commission for wells upon town lots or other small tracts. The basis for such attacks was that the Railroad Commission included in the permits the clause granting multiple completion authority which permitted the completion of each well in all of the separate reservoirs penetrated by the well, which were found to be productive. In such suits the allocation formulas were not attacked; on the contrary, the petitions in some rule 37 cases, after referring to the orders of the Commission adopting field rules, including the allocation formulas for gas and oil production affirmatively alleged that the orders of the Railroad Commission were valid and binding insofar as they regulated the production of oil and gas.

Defendants also presented evidence to the effect that they were unable to reach any pooling agreements with the plaintiffs herein.

In their arguments before this Court, defendants contend that the following language from the Normanna Case is not mere dictum but that the Court had a situation such as this in mind when they wrote:

"* * * where producers have acquiesced in and have failed to complain of the Commission's proration orders for a long period, during which time other operators have expended vast sums in exploration and drilling operations, such producers should not be heard to complain."

Our attention is called to the equitable doctrine of estoppel in pais as defined in 22 Tex.Jur.2d, Estoppel, Section 4, at page 664:

"Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity from asserting the rights that might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person who has, in good faith, relied on that conduct, and has been led thereby to change his position for the worse,

and who on his part acquires some corresponding right either of property, of contract or of remedy."

██ We do not believe that the defendants herein can bring themselves under the equitable cloak that they attempt to spread over themselves for several reasons. In the first place they cannot show the proper damages. They have not shown under the definition of estoppel to have been led to change their positions for the worse. There is no showing that anyone who drilled a well prior to the attack on the order in question has lost money. The history of the Appling Field as shown above is not the history of an old field but that of a relatively new, complex and developing field with not only new horizons and segments being brought in from time to time but an ever changing density of wells in respect to the ratios between large and small tracts. In this ever changing situation we are not asked to balance any equities where parties have been damaged in reliance on well established rules, agreed to or acquiesced in by all concerned and debatable in respect to their fairness, but we are asked to "freeze" an order of the Commission that has not only allowed the small tract operators to produce more than their fair share of the oil or gas that originally underlay their tracts, but would continue to allow them to so produce for the life of the field.

We are, in effect, being asked to do by indirection that which we would not have the authority under the law to do directly. Art. 6008, 6049c, Vernon's Civil Statutes.

In the second place, the defendants had no right under the very nature of the orders attacked to rely on them as bringing into effect some "vesting" of rights, immutable and unchangeable. Chenoweth v. Railroad Commission, Tex.Civ.App., 184 S.W.2d 711, writ ref., w. m. In this connection see Railroad Commission of Texas v. Shell Oil Company, 369 S.W.2d 363 handed down by this Court the same day as this opinion for a distinction with respect to estoppel in Rule 37 cases.

Commenting on the authority of the Commission as respects the conservation statutes, this Court in Railroad Commission v. Humble Oil and Refining Company, Tex. Civ.App., 193 S.W.2d 824, writ ref., n. r. e., stated:

"The Commission's power to regulate oil production in the interest both of conservation and of protecting correlative rights is a continuing one, and its proration orders are subject to change, modification or amendment at any time, upon due notice and hearing, either upon the Commission's own motion or upon application of an interested party. This principle is now so well established as to require no citation of authority."

In Magnolia Petroleum Company v. New Process Production Company, 129 Tex. 617, 104 S.W.2d 1106, the Court said:

"If conditions change, rights change, and the governing statutes place the matter of ascertaining such rights and determining the facts relating thereto in the first instance under the jurisdiction of the Railroad Commission."

In this connection, see a recent opinion of this Court in Railroad Commission of Texas v. Phillips, Tex.Civ.App., 364 S.W.2d 408, no writ history.

██ For the reasons discussed above we also overrule defendant-intervenors' contention that this suit is barred by the four year statute of limitations. Art. 5529, V.C. S. See this Court's opinion in Galveston Chamber of Commerce v. Railroad Commission, Tex.Civ.App., 137 S.W. 737, reversed on other grounds, 105 Tex. 101, 145 S.W. 573.

We hold that the Trial Court had the validity of a particular order before it which is to be tested under the substantial evidence rule, that such test is a matter of law, that the Trial Court found this specific order to be confiscatory and properly held it invalid. Gulf Land Company v. Atlantic

Refining Co., 134 Tex. 59, 131 S.W.2d 73, The Normanna Case cited above, Halbouty v. Railroad Commission, Tex., 357 S.W.2d 364.

■ There were no facts to be determined by a jury. The facts that the defendants rely on in an attempt to show estoppel are not materially controverted. In any event, the court heard them out and had a jury been impaneled, it would have been proper for the court to take the case from the jury and rule as he did.

■ There is conflicting evidence as to pooling offers. We hold that in this case such evidence is immaterial as proof for the validity or invalidity of this particular order. Here the question of pooling could only relate to access to the minerals involved. We do not have the question of access but that of a fair allocation of existing production. See the recent opinion of Claire Benz-Stoddard v. Aluminum Company of America, Tex., 368 S.W.2d 94.

■ In its second amended petition in intervention Intervenor Woods Exploration and Producing Company, Inc. alleged that the Railroad Commission of Texas could take into consideration, the anti-trust laws of Texas, Title 126, Vernon's Civil Statutes, in writing an order, and that the proration order under attack here was in the public interest and prevented plaintiffs from conspiring to fix production in the fields. It was further alleged that Section 19 of Article 6049e of the Conservation Acts states that nothing in the conservation laws shall affect or impair the anti-trust Acts of Texas. Aluminum Company of America excepted to this portion of Intervenor's pleadings, stating:

"* * * the sole issue in this case is whether the April 24, 1961, order is confiscatory. If it is confiscatory, then it cannot be sustained as necessary to encourage competition under either the State or Federal Anti-Trust Laws."

The Trial Court sustained this exception.

We hold that the ruling of the Trial Court was correct. See Eastern Railroad President's Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464, which established the rule that a combination to influence governmental action does not violate the anti-trust laws.

It is not necessary here for us to pass on the question of the Railroad Commission's authority to consider the anti-trust laws when writing an order. We hold that the anti-trust Act has no bearing on the validity of the order before us.

■ Defendants contend that the court erred in striking down the proration order because, and here they list some 26 segments or reservoirs of the Appling Field, there was no evidence that there was any drainage of gas from the properties of the plaintiffs and Sun in any of these reservoirs or that the plaintiffs or Sun have been deprived of a fair chance to recover the equivalent of the gas in place in any of these reservoirs. We cannot sustain this contention. If part of the order is invalid, the entire order must fall. Railroad Commission v. Rowan Oil Company, 152 Tex. 439, 259 S.W.2d 173.

■ It is further contended that the Trial Court erred in entering judgment for plaintiffs and Sun in cancelling the order in question and in not limiting the judgment to the application of the Commission's proration formula to the production of gas from one completion in a single reservoir in each well because the plaintiffs in the hearing before the Railroad Commission attacked the formula only insofar as it applied to multiple completions and did not attack it as it applied to one completion in each separate reservoir in each well.

This argument was raised in the Halbouty case cited above and was rejected. The court pointed out that proceedings before the Railroad Commission are informal and their validity will not be tested by the technical rules of pleading and practice that obtain in court trials; and the fact that one

formula is proposed before the Commission does not foreclose one's right to complain of a formula which they consider inequitable and confiscatory of their property nor does it limit the Commission solely of either accepting or rejecting the proposed formula in toto.

We have considered the assignments of error as to the admission of plaintiffs' Exhibit No. 75 allegedly containing hearsay testimony and also the failure of the court to allow the intervention of Southeastern Pipeline Company. In view of the extensive development of this case in the Trial Court, if these assignments constitute error, it was not such error as would require the reversal of the judgment. Rule 434, Texas Rules of Civil Procedure.

The judgment of the Trial Court is affirmed.

Affirmed.