**RAILROAD COMMISSION of Texas et al.,
Appellants,**

v.

**SHELL OIL COMPANY et al., Appellees.**

No. 11103.

Court of Civil Appeals of Texas.

Austin.

May 29, 1963.

Rehearing Denied June 26, 1963.

**364**

Waggoner Carr, Atty. Gen., Linward Shivers and Joseph Trimble, Asst. Attys. Gen., Hart & Hart, Walter R. Koch, Houghton Brownlee, Jr., Austin, for appellants.

R. H. Whilden, James R. Connor, Houston, Dan Moody, Jr., Austin, Robert J. Stanton, H. D. Bushnell, Tulsa, Okl., C. F. Heidrick, E. M. Cage, Dallas, Powell, Rauhut, McGinnis, Reavley & Lochridge, Frank Douglass, Austin, for appellees.

PHILLIPS, Justice.

This is an appeal by the Railroad Commission and certain intervenors from the judgment of the district court cancelling an allocation formula contained in the field rules [1] promulgated by the Commission for four oil fields in Wood County, Texas, namely, the Southeast Quitman (Kirkland), the Southeast Quitman (Rodessa), the Southeast Quitman Goldsmith (Kirkland) and the Southeast Quitman Goldsmith (Rodessa) fields. The appellees, plaintiffs below, are Shell Oil Company, Amerada Petroleum Corporation and Sun Oil Company.

Appellees brought suit under Section 8 of Article 6049c, Vernon's Texas Civil Statutes, alleging that the allocation of allowables among the wells set out in Rule 3 [2] of the abovementioned field rules prorating the wells in each of the four fields in question on a 50% per well 50% acreage basis fails to protect the correlative rights of the parties, that the formula causes uncompensated drainage from the appellees' leases and deprives the appellees and their royalty owners from the reasonable opportunity of producing their fair share of oil from the reservoirs and further deprives them of their property without due process of law. Appellees further allege that there is no substantial evidence to sustain the 50-50 allocation formula. In addition to declaring the allocation formula null and void, the appellees asked that the court grant them an injunction permanently enjoining the Commission from applying the 50-50 for allocation formula to the fields in question.

1. Field Rules issued under Special Order No. 2-48,826 dated June 27, 1962.

2. RULE 3: The daily total field oil allowable as fixed by the Commission after deductions have been made for marginal wells, high gas-oil ratio wells and wells which are incapable of producing their allowables as determined hereby, shall be distributed among the remaining producing wells in the field on the following basis.
    (a) The daily acreage allowable for each well, after said deductions have been made, shall be that proportion of fifty (50) percent of the daily field allowable which the acreage assigned to the well bears to the remaining acreage assigned to all the wells in the field.
    (b) The daily per well allowable for each well, after said deductions have been made, shall be determined by dividing fifty (50) percent of the total field daily allowable by the number of producing wells in the field.
    (c) The total daily oil allowable for each well shall be the sum of its per well and acreage allowables.

The trial court found that Rule Number 3 of the abovementioned field rules was not reasonably supported by substantial evidence, was arbitrary, unreasonable, capricious and confiscatory, that it was null and void and permanently enjoined the Commission from enforcing the allocation formula.

The intervenors are C. A. Green and R. J. McMurrey. These intervenors aligned themselves with the position taken by the Railroad Commission. C. A. Green owns the fee to a 1-acre tract which has one well triply completed in the Southeast Quitman (Kirkland), the Southeast Quitman (Rodessa), and the Southeast Quitman (Gloyd) fields. R. J. McMurrey has a well on the R. J. McMurrey Quitman Independent School District 2.03 Tract, which is dually completed in the Southeast Quitman Goldsmith (Kirkland) and Southeast Quitman Goldsmith (Rodessa) fields.

The Railroad Commission and the intervenors will be referred to as appellants unless otherwise designated by name. The oil companies, plaintiffs in the trial court, will be referred to as appellees.

Appellants assign error to the judgment of the trial court in sustaining special exceptions to their petition, the exclusion of certain evidence, in denying the appellants a jury trial on facts allegedly creating estoppel, and further that Rule No. 3 of the Commission's field rules was supported by substantial evidence.

We hold that the judgment of the trial court is correct.

The four oil fields in question are part of the Quitman structure which is composed of some 37 separate reservoirs containing more than 300 wells. The discovery well was drilled in 1942.

The Southeast Quitman (Rodessa) and the Southeast Quitman (Kirkland) fields were discovered in September 1959. These two fields occupy approximately the same geographic area but are separated vertically by rock strata which are impervious to

oil and gas. The Southeast Quitman Goldsmith (Rodessa) and Southeast Quitman Goldsmith (Kirkland) fields were discovered in January and February 1960, respectively. The latter fields are near one another and are separated vertically by impervious rock strata. Each field now has several wells completed in it. Many of the wells are dual completions and some are triple completions. Immediately after the expiration of the discovery allowable period, a field rule hearing was held on February 16, 1961, for the Southeast Quitman (Rodessa) field. On March 13, 1961, the Commission adopted field rules for the Southeast Quitman (Rodessa) field which included the 50–50 proration formula complained of including 40-acre proration units. No formal order was issued on these field rules and this allocation formula never became final, as on March 27 and 28, 1961, within the 15-day period allowed therefor under the rules of the Commission, each of the appellees filed a motion for rehearing on the matter of the allocation formula for the Southeast Quitman (Rodessa) field. These motions for rehearing were granted by the Commission on July 12, 1961 and a rehearing thereon was set for August 3, 1961.

On April 25, 1961, a field rule hearing was held for the Southeast Quitman (Kirkland) field. On August 3, the rehearing on the Southeast Quitman (Rodessa) field rules was held. On October 5, 1961, a field rule hearing was held for the Southeast Quitman Goldsmith (Kirkland) and Southeast Quitman Goldsmith (Rodessa) fields.

No field rules were adopted by the Commission on the basis of these three hearings.

The Commission at a formal conference held November 8, 1961, noting that there had been a long delay in consideration of the applications for field rules in the four fields involved in this suit set another hearing on all four fields for December 4, 1961, to give all interested parties "an opportunity to present evidence and argument that will aid the Commission in establishing a

fair and reasonable method of allocation of allowables for such fields."

At a hearing held December 4th and 5th, 1961, for the purpose of considering the allocation formula to be adopted for the four fields involved in this suit, the facts and circumstances relating to the fields were presented to the Commission. After allowing the interested parties an opportunity to file written arguments, the Commission, purportedly acting on the basis of the evidence heard at the December 4th–5th hearing promulgated the order, Rule 3 of which has been declared invalid, adopting for each of the fields in question an allocation formula providing for allocation of allowables 50% on acreage assigned and 50% on a per well basis. Proration units were set at one well for 40 acres.

Within the 15 day period allowed by the rules of the Commission, appellees filed motions for rehearing asking the Commission to rescind the 50–50 allocation formula and adopt as part of the field rules applicable to each of these four fields an allocation formula that would afford to the appellees a reasonable opportunity to recover their fair share of the oil in the field. On July 18, 1962, these motions were denied by the Commission.

Appellees filed this lawsuit on August 8, 1962.

Beginning with the abovementioned hearing on April 25, 1961, and continuing through the subsequent hearings appellees maintained the position that the 50% per well 50% acreage allocation formula would be unfair and that in order to protect the correlative rights of the plaintiffs and their royalty holders there should not be any per well factor in the allocation formula and the appellees further requested that the Commission adopt an allocation formula based 100% on acreage.

The evidence adduced at the trial discloses that the wells located on the small tracts owned by appellant intervenors have already recovered from each zone in which they have been completed more than the recoverable reserves which were originally underlying the tract. It is also undisputed that each of the wells has already paid for itself, and in fact returned a net income substantially in excess of its original cost. The evidence further discloses that any future production from appellant intervenors' 1-acre and 2.03 acre tracts respectively would be produced from uncompensated net drainage from some other tract.

Appellees offered testimony to show that in the case of appellant intervenor Green more than 90% of the uncompensated net drainage has and will come from tracts in which appellees have an interest. That appellant intervenor McMurrey's uncompensated net drainage would amount to 86% of his production and that this would also represent drainage from tracts in which the appellees have an interest. These figures were, apparently, not challenged by any of the appellants.

Considering the uncompensated drainage that appellant intervenors have already caused by their production under their discovery allowables and under the 50–50 proration formula, it becomes apparent that future production from these wells will be, for the large part, drainage from adjoining leases as long as production is continued under the 50–50 formula.

Appellees based their argument in the trial court and in this Court on the holding of the Supreme Court in Atlantic Refining Company v. Railroad Commission, generally referred to as the Normanna case, 162 Tex. 274, 346 S.W.2d 801, and Halbouty v. Railroad Commission, generally referred to as the Port Acres. case, Tex., 357 S.W.2d 364. These cases held that gas allocation formulas based on $\frac{1}{3}$ per well and $\frac{2}{3}$ acreage were confiscatory under the facts presented.

■ We hold that the Normanna and Port Acres decisions are controlling in the case at bar, that Rule 3 of the order before us is invalid in that it does not afford an

opportunity to all of the parties to produce and save their fair share of the minerals.

The Port Acres case followed the decision in the Normanna case and is the latest expression of the Supreme Court on the question of correlative rights and confiscation of hydrocarbons by an adjoining lease holder by virtue of an illegal proration formula promulgated by the Railroad Commission.

In the Port Acres case a number of operators in the Port Acres Field attacked the proration formula of the Railroad Commission allocating gas production on a ⅓ well ⅔ acreage basis. A number of small tract owners intervened and aligned themselves with the Commission. Some of the small tracts which had Rule 37 wells ranged from ²⁄₁₀ of an acre up to 5 acres.

The Court cites Article 6008, Sec. 12, V.A.C.S., which provides that the Commission shall regulate and prorate gas production in the reservoir "on a reasonable basis." The Article further provides that "[t]he monthly reservoir allowable shall be allocated among all wells entitled to produce gas therefrom so as to give each well its fair share of the gas to be produced from the reservoir, provided that each well shall be restricted to the amount of gas that can be produced from it without waste." Section 12 of the statute provides that the Commission shall take into account in fixing the daily allowable production for each gas well the size of the tract, the relation between the daily producing capacity and the aggregate daily capacity of all gas wells and all other factors which are pertinent.

The Port Acres opinion continues:

"In Normanna the evidence shows that the ⅓–⅔ formula would result in the drainage of a tremendous quantity of gas and condensate from other leases in the field to the .3-acre lease in question, though the precise amount of drainage was incapable of ascertainment, and of course such drainage could not be compensated by drainage from the .3-acre tract to other leases in the field. The evidence further showed that the order would allow the well on the .3-acre tract to produce at a rate of over 200 times as much gas per acre as a well on the 320-acre unit established by the spacing pattern. We think the evidence here is comparable to that in Normanna. Under the order adopted in the Port Acres Field more than 90%' of the hydrocarbons recovered by the Rule 37 wells would be drained from other leases in the field. As said in Normanna the proration formula adopted here of ⅓–⅔ does not come close to compelling ratable production nor afford to each producer in the field an opportunity to produce his fair share of gas from the reservoir.

\*     \*     \*     \*     \*     \*

"From the foregoing it follows that the ⅓–⅔ proration formula as applied by the Commission in the Port Acres Field is invalid in that it does not afford an opportunity to all of the parties to produce and save their fair share of the minerals or their equivalent. We hold that it is not reasonably supported by substantial evidence."

■ The Attorney General in representing the Railroad Commission contends that the order in question is supported by substantial evidence and that under the numerous cases that have sustained orders of the Commission under the substantial evidence rule, the order should be allowed to stand. He contends that there is no dispute in that intervenor appellants Green and McMurrey had produced more oil up to June 1962, from the Rodessa and Kirkland zones than was originally in place under these tracts. He contends that much of this production was obtained under "discovery allowables" which permits, under a Commission ruling, the first five wells in a newly discovered field to produce more than the normal amount of oil per day for a period

not to exceed eighteen months. This is a bonus for those who invest their capital in a high risk venture and is a means of speeding up search for reserves. It is not necessary for the purpose of this opinion to discuss whether past excessive production on the part of the intervenor appellants came from discovery allowable production or through the 50–50 proration formula. The fact that these appellants will continue in the future to produce more than their fair share of the oil through drainage from the tracts of their neighbors is sufficient to strike the formula down under the doctrines announced in the Normanna and Port Acres cases.

The argument is also advanced that intervenor appellant McMurrey's lease contained no pooling provisions and that he was forced to drill a well under an exception to Rule 37; that while intervenor appellant Green whose well is a triple completion had been offered a pooling arrangement by Amerada, that the pooling agreement would have applied to only two zones and that he would have been left unprotected in the third zone. Granted, arguendo, that these facts are true, they are certainly insufficient reasons to uphold a specific order that is confiscatory in nature.

The Attorney General further contends that the Normanna and Port Acres decisions were concerned with gas that is regulated by Sec. 12 of Art. 6008, V.C.S., set out above, while the case is controlled by Sec. 7 of Art. 6049c, V.C.S. Article 6049c which requires that the Commission " * * * shall distribute, prorate, or otherwise apportion or allocate, the allowable production among the various producers on a reasonable basis."

There is nothing in either of the two statutes quoted above to distinguish them one from the other in respect to the Commission's duty to protect the correlative rights of adjoining leaseholders and in giving each of the parties the opportunity to produce his fair share of oil or gas from the reservoir. In discussing the cases leading to the holdings in both the Normanna and Port Acres decisions, Rule 37 cases involving rights to oil wells as well as gas allocation formula cases were cited.

In Railroad Commission v. Williams, Tex., 356 S.W.2d 131, the Supreme Court stated:

"The basic right of every landowner, including the small tract owners, is to a fair chance to recover the oil and gas in and under his land or their equivalents in kind.

\* \* \* \* \* \*

"The rule of fair chance or fair share is the reason for the 'confiscation' exception to Rule 37 whereby an owner or lessee can get a well permit for a small tract (citing cases). In fact, it has been held that the proper test of confiscation under Rule 37 is whether an owner, with the wells which already exist, has been accorded a fair and equal opportunity with other producers of surrounding tracts within the drainage area to recover his fair share of the oil in place beneath his tract. If he has, no confiscation results."

Both the Normanna and Port Acres cases cite with approval the following language from Marrs v. Railroad Commission, 142 Tex. 293, 177 S.W.2d 941 (an oil proration formula case):

"Under the settled law of this State oil and gas form a part and parcel of the land wherein they tarry and belong to the owner of such land or his assigns. (citing cases); and such owner has the right to mine such mineral subject to the conservation laws of this State. Every owner or lessee is entitled to a fair chance to recover the oil or gas in or under his land, or their equivalent in kind, and any denial of such fair chance amounts to confiscation."

Appellants cite as error the action of the trial court in striking from the appellants' pleadings by sustaining special exceptions.

thereto, the following portion of the order before this Court:

## "SPECIAL ORDER ADOPTING RULES AND REGULATIONS FOR CERTAIN QUITMAN FIELDS, WOOD COUNTY, TEXAS

"WHEREAS, After due notice, the Railroad Commission of Texas held a hearing on December 4, 1961, on its own motion, to consider, among other things, the matter of allocation of allowables and the adoption of rules and regulations to govern the drilling, completion and operation of wells in certain Quitman Field Area, Wood County, Texas; and

"WHEREAS, From evidence adduced at said hearing, and from a review of its own records and reports, it is apparent to the Commission that the subject fields in the Quitman Fields Area, namely, the Southeast Quitman (Kirkland) Field, the Southeast Quitman (Rodessa) Field, the Southeast Quitman Goldsmith (Kirkland) Field, and the Southeast Quitman Goldsmith (Rodessa) Field were discovered in 1959 and 1960; that each field is developed with five or more wells; that field rule hearings, Dockets No. 120-6-45,-403, No. 120-6-46,141, and No. 120-6-46,521, have been held for each of the four named fields wherein technical reservoir data was adduced into the record; that Commission action was delayed on such hearings, for such a time that a review of the matter of allocation of allowables was considered advisable; that rules made effective by Commission action on March 13, 1961 for the Southeast Quitman (Rodessa) Field have been operative although the subject of a rehearing; that reservoir data available supports a drainage pattern of a well to each forty acres; that the rules proposed, except the proposed allowable allocation rule, are acceptable rules to govern development and production operations for said fields; and

"WHEREAS, it further appears to the Commission that the fields designated are in the proximity of many other Quitman Fields which have heretofore had rules adopted, including allowable allocation formulae, that have been effective for a considerable period of time; that these allowable allocation rules were adopted prior to the recent Supreme Court decisions which invalidated certain per well factors in allowable allocation as being unreasonable, and, which have placed on the Commission, the extremely knotty problem of adopting some form of allowable allocation that gives each operator in a field an opportunity to recover his fair share of the oil and gas in place; that one of the four named fields has operated under rules adopted March 13, 1961, prior to the time that the Normanna decision became final; and

"WHEREAS, The Commission, from its study of the Normanna decision, and other decisions relating to the overall matter of 'opportunity to produce a fair share' is of the opinion that such decisions do not require adjustment of allowable allocation formulae which have been adopted and made effective for a field prior to the time the Normanna decision became final; that reliance upon a formula established prior to the Normanna decision has caused operators to invest large sums in drilling and development costs under conditions that were sufficiently stable to be considered good business investments; that any change would cause hardship and loss to all parties having interest in such investments; that, in fact, the Supreme Court, in the Normanna Case, by use of the following language:

" 'We are in agreement with the reasoning of the courts in the Humble and Standard Oil Company cases in holding that where producers have acquiesced in and have failed to complain of the

**370**

Commission's proration orders for a long period, during which time other operators have expended vast sums in exploration and drilling operations, such producers should not be heard to complain.'

"supports the Commission's conclusion that the named fields all located in the Quitman Fields Area, being a closely associated group of fields on a common structure, having been subjected to an allowable allocation formula effective for a long period of time, should not now be subjected to a different allowable allocation formula; and

"WHEREAS, From evidence adduced at said hearing, the Commission is of the opinion and finds that waste as the term is defined in the applicable statutes will take place in said fields unless rules are adopted by the Commission for the prevention thereof; that the following field rules are necessary to prevent such waste and to provide for a more orderly development and operation of said fields and that the allocation formula adopted herein is reasonably necessary to protect the rights of all parties from confiscation."

Appellants maintain that this part of the order was relevant in relating the history of the Quitman structure which the Commission considered to be the basis of its order. In discussing this point we will include appellants' second point of error in that the trial court erred in denying to appellants a jury trial on the fact issue of unreasonable delay and estoppel by sustaining the exceptions to all of appellants' pleadings which recited the acts and conduct of plaintiffs relating to the history of proration formulas in the Quitman Field area.

■ The trial court's action in striking this portion of the pleading was correct in that the conclusions stated by the Commission in respect to the findings set out in its order all related to fields other than the fields in question and were not material to the validity or invalidity of the order before the court.

■ The Supreme Court held in Railroad Commission v. Magnolia Petroleum Company, 130 Tex. 484, 109 S.W.2d 967, (also see 43 Tex.Jur.2d, Sec. 604) that it would not measure the validity of the Commission's orders "by the reason it gives for same." The court is bound by the Commission's findings only on a material controverted fact situation that is supported by substantial evidence. Gulf Land Company v. Atlantic Refining Co., 134 Tex. 59, 131 S.W.2d 73. Railroad Commission v. Shell Oil Company, 139 Tex. 66, 161 S.W.2d 1022, holds that Sec. 8 of Article 6049c, V.C.S., "clearly contemplates that the evidence shall be taken anew in the district court." When this proration formula was attacked in the district court it would stand only if supported by substantial evidence to be adduced before the court at trial. The reasons given by the Commission for its order would merely be evidence to be admitted or excluded by the court under the rules of pleading and of evidence.

Appellants base their theory of estoppel on the following language in the Normanna opinion:

"* * * where producers have acquiesced in and have failed to complain of the Commission's proration orders for a long period, during which time other operators have expended vast sums in exploration and drilling operations, such producers should not be heard to complain."

Appellants maintain that the following conduct of appellees amounting to an estoppel extends back to 1957 when the first 50–50 formula in the Quitman area was adopted by the Commission for the Quitman (Rodessa) reservoir. Shell had requested 75% acreage—25% per well. Amerada had a twenty acre lease in that reservoir. Neither appealed from the order.

Appellants further contend that the following conduct of appellees supports their theory of estoppel.

The 50–50 formula was again adopted for the Quitman (Kirkland) reservoir in 1958. Though Shell had requested 75–25, no appeal was taken.

In May 1960, the Commission adopted the 50–50 acreage allocation formula for the Quitman Northwest (Paluxy) field. Shell, having again requested 75–25, nevertheless acquiesced in the 50–50 formula.

At a field rule hearing on January 3, 1961, for the Quitman Northwest (Kirkland) reservoir, Shell Oil Company itself recommended the 50–50 formula, and the Railroad Commission adopted its recommendation. When C. A. Green made application to the Railroad Commission for a Rule 37 permit to drill a well on his one acre tract, Shell Oil Company wrote to the Commission waiving any protest thereto. Later Shell also waived protest to the triple completion by C. A. Green of the well on his one acre tract. No suit was filed attacking the permits to drill and complete either the McMurrey or Green wells.

Shell Oil Company's division manager wrote a letter dated January 31, 1961, addressed to certain operators which included appellant intervenor C. A. Green recommending a 50–50 formula for the Southeast Quitman (Rodessa) fields at the hearing to be held. That at the field rule hearing held on this field, sixteen days after the letter was written, Shell recommended a 75–25 per well formula.

■ The trial court's action in sustaining special exception to the abovementioned allegations and refusing appellants a jury trial thereon was correct in that if all these facts alleged are true, the question of estoppel and undue delay would not have been before the court as a matter of law.

There was no delay in the actions of the appellees regarding any of the hearings involving either of the four fields in question, nor was there any delay in bringing the action that is now before this Court when the ruling of the Commission proved to be adverse to the interests of the appellees. The acts or omissions on the part of the appellees that were not considered by the court (with the exception of the letter from Shell's division manager) all pertained to fields other than the four fields in question, nor did any of the alleged acts or omissions, with the exception of the abovementioned letter, refer to any of the hearings that led to the promulgation of the order presently before this Court. The letter from Shell's division manager urging a 50–50 formula for the Southeast Quitman Rodessa was merely in the form of a recommendation and in fact was not followed by Shell in that they requested a 75–25 allocation formula at the hearing held sixteen days after the letter was written. The letter was written after appellant intervenors had drilled their wells so no reliance to detriment could have been placed upon it.

Appellants sought the admittance of the abovementioned evidence under the theory that appellees here are barred from attacking these allocation formulas because of this prior course of conduct on the part of appellees constituting an estoppel. Appellants cite Midas Oil Company v. Stanolind Oil & Gas Company, 142 Tex. 417, 179 S.W.2d 243; Stanolind Oil & Gas Company v. Midas Oil Company, Tex.Civ.App., 123 S.W.2d 911, writ dismissed; Stanolind Oil & Gas Company v. Midas Oil Company, Tex.Civ.App., 143 S.W.2d 138, writ refused; and Stanolind Oil & Gas Company v. Midas Oil Company, Tex.Civ.App., 173 S.W.2d 342, for the proposition that while Article 6049c, Section 8, V.C.S., does not fix a definite time for appealing from orders of the Railroad Commission in oil and gas cases, such appeals must be taken without unreasonable delay or the complaining party will be held to have been barred from obtaining a cancellation of the order. These cases dealt with Rule 37 permits and unreasonable delay in attacking the very permits that were before the courts in each of the particular cases cited. In these cases

there was a question of estoppel as affecting a vested right to the only known method of access to the minerals underlying a given tract of land. These cases are not in point here.

A proration formula is subject to the continuous supervision of the Railroad Commission and may be changed at any time. Railroad Commission v. Humble Oil and Refining Co., Tex.Civ.App., 193 S.W.2d 824, writ ref., N.R.E.[3] The ultimate decision as to the contents of any order of the Commission rests with the Commission itself. The responsibility for the order rests with the Commission and not with the various interested parties that appeared before the Commission either as proponents of the order or antagonists thereto. In discussing the Midas Cases appellants assert that the issue here is not the power of the Commission to act, but rather the right of an operator to force the Commission to change its established method of allocation. 31 C.J.S. § 74, page 280 in discussing Estoppel, states: " * * * where no available right is parted with and no injury suffered there can be no estoppel in pais." It is difficult to see how appellees by their conduct in other oil fields in the area, either through their action or inaction, could have led appellants to feel that they could rely on a right to a particular allocation formula in a newly discovered field. Whatever action appellees took in other fields would necessarily have been determined by the factors involved in those particular fields as they existed at the time the action was taken. This would be particularly true as regards the size of the tracts involved in those fields. In addition, it is difficult to see how appellants have sustained legal damage by appellees' attack on an order that allows appellants to produce more oil than they are rightfully entitled to. This is not a case where the question of appellants' right to produce *their* oil is jeopardized as in the Rule 37 cases cited, this is an attack on a particular formula in a particular order that is patently unjust. It is not the prerogative of this Court to write an order that would be fair to the parties involved. This is the duty of the Commission.

In further support of their theory of estoppel appellants have cited Railroad Commission v. Mackhank Petroleum Company, Tex.Civ.App., 186 S.W.2d 351, rev. 144 Tex. 393, 190 S.W.2d 802, for the proposition that the court recognized the distinction between the question of the power of the Railroad Commission, on the one hand, and the rights of private litigants on the other hand with reference to changes in proration orders. This case involved the correlative rights of the parties in the same field that were arrived at by contract between the parties and acquiesced in by the Commission. The successors to the original contracting parties were estopped from attacking a proration order on the grounds that it was discriminatory and confiscatory in that it did not protect correlative rights. In the case at bar there has been no contract between the parties and separate fields are involved.

Board of Water Engineers v. Colorado River Municipal Water District, 152 Tex. 77, 254 S.W.2d 369, cited by appellants as authority for an estoppel in the case at bar is not in point as this case concerns delay in attacking the particular order involved in the case, not a failure to attack previous similar orders concerning an allegedly similar situation. In addition, the order of the

3. The Commission consistently includes the following provisions in Field Rule orders which are included in the order before this Court, to wit:
"This cause be held open on the docket for such other and further orders as may be necessary."
"PROVIDED, HOWEVER, that any reservoir not identified herein, or any reservoir that may later be discovered in this multiple reservoir area, will be assigned a designation in the same manner as set for the aforementioned reservoirs, but said rules as adopted herein will not be effective for additional reservoirs unless and until specifically adopted after due notice and hearing."

Board in this case fixes rights of the parties involved with respect to the districts created much in the same way that the Railroad Commission does in a Rule 37 case. In fact the Court cites one of the Midas Cases, supra, (142 Tex. 417; 179 S.W.2d 243) for a comparison.

For a further discussion of proration orders and estoppel see Railroad Commission v. Aluminum Company of America, Tex.Civ.App., 368 S.W.2d 818.

■ Appellants' third point contends that the trial court erred in refusing to admit into evidence their exhibit number 4 which was written testimony of Shell Oil Company at the hearing before the Commission of January 3, 1961, on field rules for the Quitman Northwest (Kirkland) field.

The Quitman Northwest (Kirkland) is not one of the fields involved in this lawsuit, however, appellants maintain that the hearing thereon was held six weeks prior to the first field rule hearing on one of the four reservoirs involved in this suit. Appellants contend that this evidence would show that the Kirkland reservoirs are similar to the reservoirs in the fields before this Court and further that at this hearing Shell's representatives thought a 50–50 formula for this reservoir was fair and proper.

We hold that the evidence was properly excluded.

The evidence was not admissible on any theory of estoppel for the reasons we have set out above. In the next place, there is no material dispute as to the similarity between the Kirkland reservoirs and those involved in this suit. The evidence, at best, would have been merely cumulative of evidence similar in nature already before the Court and its admissibility was within the discretion of the trial court.

■ Appellants maintain that the order in question is supported by substantial evidence.

We do not agree. We hold that the undisputed evidence demonstrates that the proration formula in this order, under the doctrine announced in the Normanna and Port Acres cases, has allowed an unreasonable amount of oil to be confiscated from the adjoining tracts and will continue to do so if allowed to stand and that as a matter of law the order is not supported by substantial evidence and should be struck down.

The judgment of the trial court is affirmed.

Affirmed.