**PUROLATOR ARMORED, INC.,**
**Appellant,**

v.

**The RAILROAD COMMISSION OF**
**TEXAS, et al., Appellees.**

**No. 13771.**

Court of Appeals of Texas,
Austin.

Nov. 16, 1983.

---

Ben Sarrett, Mauro, Sarrett & Wendler, Austin, for appellant.

Mark White, Atty. Gen., Douglas Fraser, Asst. Atty. Gen., Austin, for Railroad Com'n of Texas.

Thomas F. Sedberry, Small, Craig & Werkenthin, Austin, for Wells Fargo Armored Service Corp.

POWERS, Justice.

Purolator Armored, Inc. sued the Texas Railroad Commission for judicial review of a final order issued by the agency. The order in dispute authorizes Wells Fargo Armored Service Corporation to transport coin, currency, and similar high-value articles between points in 143 contiguous Texas counties that comprise approximately the northern half of the State. After a review based upon the agency record, the district court affirmed the final order of the agency and Purolator appealed to this Court. We affirm the judgment below. Tex.Rev.Civ. Stat.Ann. arts. 911b, §§ 5a(c)–(h), 20 (1964) (Texas Motor Carrier Act); 6252–13a, §§ 19, 20 (Supp.1982) (Texas Administrative Procedure and Texas Register Act, or "APTRA").

The Commission's final order authorizes Wells Fargo, as a "specialized motor carrier," to transport the specified commodities within the designated counties. The provisions of art. 911b, § 5a(c)–(h) pertain generally to such carriers in their initiation and conduct of intrastate operations. Subsections (c) through (f) regulate the Commission in its granting of certificates of public convenience and necessity on the carriers' application therefor. The issues on appeal in the present case center around the provisions of subsection (d). That subsection states in part as follows:

> The Commission shall have no authority to grant any application for a certificate of convenience and necessity authorizing operation as a "Specialized Motor Carrier" or any other common carrier unless it is established by substantial evidence (1) that the services and facilities of the existing carriers serving the territory or any part thereof are inadequate; (2) that there exists a public necessity for such service, and (3) the public convenience will be promoted by granting said application. The order of the Commission granting said application and the certificate issued thereunder shall be void unless the Commission shall set forth in its order full and complete findings of fact pointing out in detail the inadequacies of the services and facilities of the existing carriers, and the public need for the proposed service . . . .

Purolator attacks the trial court judgment for its failure to hold the Commission's final order invalid as being in violation of one or more of the requirements contained in the quoted paragraph.

The following propositions appear to be undisputed and will assist in understanding our discussion of Purolator's points of error. Purolator is presently the sole "specialized motor carrier" authorized by the Commission to transport throughout the State the high-value commodities that Wells Fargo intends to carry if its certificate is not invalidated on appeal. The certificate issued to Wells Fargo permits it to transport the same commodities between all points within 143 contiguous counties in the northern half of the State. Purolator is presently the sole carrier of those commodities between municipalities. The expected competition for carriage of the commodities, within the northern half of the State, gave rise to the contested case proceeding which we review.

Because of the nature of the commodities to be carried, banks are the principal shippers and armored cars and guards are normally required to protect the cargoes. Purolator charges for its services in accordance with a tariff or schedule of official rates and charges on file with the Commission; it may charge no other rates or charges in its regulated service. The tariff sets different rates and charges for various categories or kinds of carriage: "scheduled service rates," the category of lowest cost to the shipper; "non-scheduled service rates"; "hourly service rates"; rates for "exclusive use of vehicle"; and rates for "holiday and Sunday service."

Among other allegations made by Wells Fargo in its application to the Commission, the carrier charged that Purolator "does not provide the required frequency of service nor does it provide pick up and/or delivery at the times needed by many members of the public." Wells Fargo proposed in its application, which was approved, to pick up and deliver the commodities on a "daily, weekly, bi-weekly and [on an "on-call" or request basis] to meet the varying needs of the shipping public," together with "any other frequency of service as required or requested by the shipping public." Purolator possesses authority to provide service of similar frequency and flexibility; however, Wells Fargo contends that Purolator does not in fact provide service of that character, leaving unsatisfied the public need therefor.

## SUFFICIENCY OF THE FINDINGS OF FACT UNDER ARTICLE 911b, § 5a(d)

In Purolator's first two points of error, it contends the Commission's final order omits "to set forth full and complete Findings of Fact pointing out, in detail, the inadequacies of the services and facilities of [Purolator]; [and] the public need for [Wells Fargo's] proposed service," in violation of the explicit requirements of art. 911b, § 5a(d). We may not, therefore, avoid setting forth in detail the more important findings of basic fact made by the Commission and recited in its final order. The following are either stated in the order verbatim or they are necessarily implied from the words used therein:

1. Wells Fargo had, on December 31, 1979, $32,405,255 in assets and $8,602,103 in liabilities.

2. Wells Fargo has since 1970 provided a local armored car service in the Dallas-Fort Worth area.

3. "Purolator is the sole carrier presently authorized to provide the proposed service in the disputed area."

4. In the area intended to be served by Wells Fargo, there are more than 700 banks, of which number Purolator serves only 326. Thirty-eight banks not presently receiving transportation services are located in communities situated on existing Purolator routes.

5. Banks in numerous communities specified in the final order had requested without success that Purolator modify its schedules and routes to meet their requirements for armored car service in the transport of currency and coins. These banks had sustained avoidable penalties, incurred unnecessary expense, suffered other inconveniences, and had been exposed to security

risks because of a want of flexibility in the scheduled stops provided by Purolator, both as to the days of such stops and as to the time of day they are made. The banks had, in addition, found prohibitive the cost of exclusive or special armored-car service offered by Purolator for non-scheduled stops. Certain shippers had requested regular or scheduled service of Purolator but had been "advised that no regular service was available [in their communities], and would not be provided . . . because regular route service was not justified."

6. Wells Fargo "proposes to provide a variety of services including pick-up and delivery at customer locations, flexible scheduling," and related services listed in the findings of fact; and Wells Fargo "will establish specific routes which are not only efficient for the motor carrier, but will provide the maximum service to the largest number of customers."

7. Seventy-four banks appeared in the agency proceeding to support the request by Wells Fargo for authority to serve shippers in the 143 counties comprising the disputed area.

8. The Federal Reserve Bank in Dallas, situated in one of the counties proposed to be served by Wells Fargo and presently served by Purolator, has agreed with Purolator "as to the hours and schedules of service to" banks that are members of the Federal Reserve System. (The evidence shows that this finding refers to 27 scheduled routes conducted by Purolator for the Federal Reserve Bank in Dallas, over which routes in 1979 Purolator carried 10,418 armored car shipments between points in the disputed area.) The Federal Reserve Bank in Dallas bears the cost of shipments between itself and its member banks, and determines the frequency of such shipments based upon requests made by member banks for transportation service. However, the Federal Reserve Bank "does not arrange for all armored car service to all of its member banks." The Federal Reserve Bank, with respect to the shipments for which it pays, requires Purolator to deliver to the member banks "within specific busi-

ness hours, but the actual times [of delivery] are left to Purolator." Under the agreement between the Federal Reserve Bank and Purolator, "small and medium-sized banks [ordinarily] receive armored car shipments once a week and the larger banks receive more frequent service." The Federal Reserve Bank had "requested Purolator to revamp its entire network to accommodate member requests for more frequent service [but failed to] give Purolator a list of particular banks to be served or routes and [Purolator] has not undertaken to revamp the entire network." Purolator has offered to provide additional service to member banks on two conditions which the Federal Reserve Bank finds unacceptable: (a) more frequent service which would "adversely affect the [existing] schedules of member banks along the [existing] route"; or (b) additional service to member banks not on established routes upon payment by the Federal Reserve Bank of "the higher tariff rate for exclusive service . . . ." The Federal Reserve Bank "desires regularly scheduled service rather than special or exclusive service to a particular bank." "An increasing number of member banks of the Federal Reserve System are asking to be placed on existing routes and [an] increasing number of member banks want more frequent service."

9. Within a large portion of the disputed area, "[t]here has been significant growth in the size of nearly all of the banks that support the application" of Wells Fargo. Nevertheless, "[t]he routes operated by Purolator are basically the same as they were in 1968."

10. Purolator's traffic had, for the first quarter of 1980, "produced an overall operating ratio of 83" from both regulated and unregulated traffic within the State. Purolator's intrastate regulated traffic for the period had resulted in $187,234 of revenue and $179,798 of expenses.

Purolator argues that most of the findings of fact made by the Commission, as they relate to transportation difficulties experienced by banks in the disputed area, do not "point out" any inadequacy of Purola-

tor's service or facilities, nor do they "point out" that Purolator ever denied the banks transportation service. With respect to the finding of fact that Purolator serves only 326 of the more than 700 banks in the disputed area, and that 38 banks not being served by Purolator are situated in communities on existing Purolator routes, Purolator argues that the finding· is infected by "fundamental error" for two reasons: (a) the record shows that Purolator serves 520 banks in the disputed area, for it serves approximately 200 of the 700 banks in its unregulated service; and (b) of the 38 banks referred to in one part of the finding of fact, eleven are in Oklahoma or Louisiana and only four of the 38 appeared in behalf of the application filed by Wells Fargo. Of these four, three had not requested Purolator to furnish transportation service and one had testified that his present arrangement for "private operation" was most convenient for him.

■ We turn first to the last-named complaint by Purolator, wherein it contends the Commission committed "fundamental error" in the agency's finding of basic fact relative .to the 700 and to the 38 banks referred to in the preceding paragraph. We reject the complaint. The Commission's finding of fact must be taken as true for it is supported by substantial evidence *as far as it goes.* Purolator's contention amounts to a complaint that the finding did not go far enough—that it did not include the additional facts that Purolator served many of the banks in its non-regulated service, that eleven of the 38 banks not served at all were in neighboring States, and so forth. The record reveals, however, that Purolator's motion for rehearing in the Commission specifically requested only two additional findings of basic fact, neither of which relates to the point under discussion. Purolator therefore preserved nothing for review in this respect. APTRA § 16(b), (e). We turn then to Purolator's other complaints relative to the sufficiency of the findings of basic fact which the Commission *did* make—a matter *requiring more* discussion.

Article 911b, § 5a(d) provides that the Commission's order

shall be void unless the Commission shall set forth in [the] order full and complete findings of fact pointing out in detail the inadequacies of the services and facilities of the existing carriers, and the public need for the proposed service . . . .

The self-evident purposes of this requirement are as follows: (a) to maximize the likelihood that the Commission's decisions in contested cases will be genuinely based upon the legal rules applicable to the granting or denying of applications for certificates of convenience and necessity and that these rules will be applied with clarity, precision, and consistency from case to case, while allowing a proper scope for agency discretion and expertise in such matters; (b) to apprise the parties of the grounds upon which the Commission's decision rests in a particular case, so they may properly formulate, prepare for, and join issue on the points in dispute, whether before the Commission by motion for rehearing or in any subsequent suit for judicial review; and (c) to enable the reviewing court to apply properly all of the standards for review applicable to the case. *Auto Convoy Co. v. Railroad Commission of Texas,* 507 S.W.2d 718, 719 (Tex.1974); *Morgan Drive Away, Inc. v. Railroad Commission of Texas,* 498 S.W.2d 147, 149–50 (Tex.1973); *Miller v. Railroad Commission of Texas,* 363 S.W.2d 244, 245–46 (Tex.1962); *Charter Medical-Dallas, Inc. v. Texas Health Facilities Commission,* 656 S.W.2d 928 (Tex.App.1983); 2 F. Cooper, State Administrative Law, 725–28 (1965). The "findings of fact" to which the statute refers are findings of *basic* fact determined from the evidence adduced, and these "findings of basic fact cannot be presumed from findings of a conclusional nature . . . ." *Morgan Drive Away, Inc. v. Railroad Commission of Texas, supra.*

■ We hold the Commission's findings of fact satisfy the requirements of art. 911b, § 5a(d) because they are sufficient to meet the underlying purposes of the statute. So much is illustrated from the use made of the findings of fact in that part of

the Commission's final order devoted to its "conclusions of law," wherein the agency set forth its rationale applying the applicable legal rules to the findings of basic fact.

The objective of the statutes providing for the State's regulation of motor carriers is not only to assure the public of transportation services at the lowest possible costs. The statutes have the larger objectives of (a) providing transportation services to all segments of business and industry where such services are necessary, (b) protecting those services against unfair and destructive competition, while (c) developing a complete transportation system. *Oil Field Haulers Ass'n v. Railroad Commission of Texas,* 381 S.W.2d 183, 194 (Tex.1964). The Commission, in its conclusions of law, applied these rules in the following manner to the agency's findings of basic facts:

### Public Need

A public need exists for the service proposed by Wells Fargo. Banks in the disputed area are growing and their requirements for more efficient movement of coin and currency are increasing. Security is a primary concern and some banks in the area have resorted to the postal service and transportation by privately owned motor vehicles for want of armored-car service. Those banks supporting the Wells Fargo application require armored car service either as a new service they are not now utilizing because of the high cost of exclusive service offered by Purolator; or they require the new service as a supplement to Purolator's regularly scheduled stops or similar scheduled stops by Wells Fargo, greater flexibility being the primary need. Purolator has "been unable to supply this kind of complete service to the shipping public."

### Inadequacy of Existing Carriers

Purolator's services and facilities have proved inadequate to meet the full extent of the public need for transportation service in the disputed area. Specifically, Purolator has not supplied the public's full need for transportation service, notwithstanding Purolator's official authority to do so, because it has refused to institute additional routes, and additional stops on existing routes, as part of its network of scheduled service, for which service shippers are charged the lowest tariff rate. A public need exists for the additional service, for in some instances Purolator has specifically refused to initiate new routes of scheduled service, or additional stops on existing routes, despite requests therefor; and a "significant number" of banks in the disputed area have refused to utilize Purolator's non-scheduled service because of its higher cost, electing instead to make other arrangements or limit their use to Purolator's regularly scheduled stops, even though they are thereby forced to incur unnecessary security risks, expense, lost earnings, and inconvenience. There are several reasons for Purolator's rigid adherence to its present system of scheduled routes and stops: (1) Purolator is "inexorably linked" to a transportation system that has become inflexible owing to the dominant effect in that system of the Federal Reserve Bank at Dallas, a dominance which results from that bank's paying Purolator for the transportation charges incurred in shipments to and from that bank and its member banks in the disputed area, coupled with the "desire" of the Federal Reserve Bank to pay for scheduled service alone and its attendant rejection of any higher-priced service; and (2) there has been a failure of communication and agreement between the Federal Reserve Bank and Purolator, as well as a failure of communication between the Federal Reserve Bank and its member banks. Whatever the reason, Purolator's failure to enlarge its routes and to provide more frequent stops on existing routes, and its corollary refusal to offer any additional transportation service except in the form of higher-cost non-scheduled service, effectively amounts to a refusal to meet the public need for the additional service; and "[a]ny system which works to offer service only at rates which effectively deny service to the public is inadequate to meet the public's general needs."

*Public Convenience*

Wells Fargo has experience in providing armored car service in the Dallas-Fort Worth area, a portion of the disputed area; Wells Fargo "can coordinate intrastate and interstate movements on the same routes" with its many shipments for non-bank customers so as to develop sufficient revenues and minimize the cost of regulated intrastate shipments for bank customers; and "[m]ost importantly ... [Wells Fargo] could supply the supplemental armored car service that would not be feasibly performed by Purolator."

*Effect on Existing Carriers*

The operation intended by Wells Fargo "will not result in a harmful diversion of revenue from Purolator"; no reason is apparent from the record why Purolator's existing customers, particularly the Federal Reserve Bank, which is the "prime beneficiary" of the Purolator system, will change carriers, therefore the "record does not suggest that a loss in Purolator's existing traffic is inevitable or even likely"; rather, the record demonstrates a need for additional and more flexible transportation services in addition to that provided by Purolator at present; yet, if traffic is diverted from Purolator, it may seek rate relief; and the public convenience and necessity would not be served by denying the public adequate armored-car service because the Commission's current rates may not be compensatory.

The essential force of the Commission's reasoning, plainly evident from its conclusions of law, is as follows: based upon its findings of basic fact, the statutory objectives of low transportation costs, providing transportation service to all segments of business and industry requiring such service, and the development of a complete transportation system, together with the Commission's policy of meeting those objectives, were in actuality not being satisfied by Purolator, notwithstanding the carrier's abstract or legal authority to provide transportation services that would meet those objectives and policy, leaving the issue to be

whether Wells Fargo's contemplated services would further the objectives without resulting in unfair and destructive competition. *Oil Field Haulers Ass'n v. Railroad Commission of Texas, supra.* That the objectives remained unsatisfied was, according to the Commission's findings of basic fact, due in part to the high rates authorized by the Commission's tariff rates and charges for exclusive or special service; however, this aspect presented no absolute or legal barrier to the Commission's authorizing the entry of a new carrier if ruinous and unfair competition would not result. And, based upon the agency's findings of basic fact, unfair and ruinous competition was not inevitable or even likely because Wells Fargo would reasonably be expected to provide transportation services (a) in the interstices left by Purolator's inflexible adherence to its existing routes and stops and (b) in meeting the greater need for armored car service resulting from a general internal growth in the business of banks within the disputed area, neither of which would require a diversion of traffic from Purolator.

Almost all of the findings of basic fact recited in the initial part of this opinion are woven into the Commission's reasoning, as set forth in its discussion entitled "Conclusions of Law," whether as basic fact findings or as conclusionary inferences drawn from more than one finding of basic fact, that is, as findings of intermediate facts. We see nothing unreasonable in the Commission's use of its findings of basic fact and we may not say that it acted arbitrarily and capriciously in its conclusions or inferences drawn from those findings of basic fact. We observe that the adjustment or correlation of the statutory objectives and official policy of the Commission, for example any adjustment between providing a complete transportation system at the lowest possible cost while avoiding unfair and destructive competition, are particularly within the agency's experience and expertise.

The purpose of judicial review of agency findings of fact is to determine whether they reasonably support the Commission's conclusions of law. *Railroad Com-*

mission of *Texas v. Graford Oil Corp.*, 557 S.W.2d 946, 950 (Tex.1977). It is apparent from the foregoing discussion that the Commission's conclusions of law are reasonably supported by the agency's findings of basic fact. Thus, the purposes of art. 911b, § 5a(d) in requiring "full and complete findings of fact" have been met, in the present case, to the extent those purposes include assuring that the agency's decision was genuinely based upon the legal rules applicable to the case. And, it is readily apparent that the Commission's findings of basic fact are sufficient to enable a reviewing court to apply properly the applicable standards of judicial review, in this instance those provided by § 19 of APTRA and § 20 of the Texas Motor Carrier Act. Given the Commission's reasoning as expressed in its final order, and the findings of basic fact upon which that reasoning is based, we are able to ascertain that the Commission has not made a clear error of judgment. It remains then to determine whether the Commission's findings of basic fact were sufficient to apprise the parties of the grounds of the agency's decision. Purolator has not suggested the contrary and in our view the findings of basic fact were sufficient for this purpose, particularly in light of the use made of them by the Commission in its rather elaborate conclusions of law. Purolator's first two points of error are overruled.

### SUFFICIENCY OF THE FINDINGS OF FACT TO SUPPORT THE CONCLUSION OF LAW THAT PUROLATOR WILL NOT BE ADVERSELY AFFECTED

 Purolator's next point of error charges that the Commission's final order violated the express command of art. 911b, § 5a(d) by the agency's omission to include in its order findings of basic fact which support the agency's conclusion of law that Purolator will suffer no "harmful diversion of revenue" by reason of the grant of authority to Wells Fargo. We disagree. The point made by the Commission's conclusions of law is that the new service intended to be offered by Wells Fargo probably would be implemented in the interstices created by Purolator's inflexibility and by meeting the enlarged need for armored car service resulting from a general internal growth in the banks within the disputed area. The conclusions of law have, in this respect, particular reference to the findings of basic fact we have summarized above under the numbers 3, 4, 5, 6, 8, and 9. Purolator does not contend that any of these findings of basic fact are without substantial evidence to support them. *See Charter Medical-Dallas, Inc. v. Texas Health Facilities Commission, supra,* pointing out that the issue of substantial evidence "goes solely to whether an agency's finding of *basic* fact are supported by substantial evidence." Whether the agency's findings of basic fact reasonably support its conclusions of law is an issue of whether the agency has made a clear error of judgment. We hold these findings of basic fact reasonably support the Commission's conclusion of law that Purolator will suffer no "harmful diversion of revenue" by reason of the grant of authority to Wells Fargo. The logical connection between this conclusion of law and the findings of basic fact to which we refer is obvious, given the reasoning set forth in the relevant portion of the final order under the heading "Conclusions of Law."

We need not decide the contention of Wells Fargo that the conclusion of law in question was not required to be made at all by art. 911b, § 5a(d)—it *was* made as a finding of ultimate fact and expressly *relied upon* by the Commission as justification for the granting of the application. That would appear to be sufficient reason for requiring that the conclusion of law have a foundation in findings of basic fact. APTRA § 16(b). Because we hold the Commission's conclusion of law to be reasonably supported in the present case by findings of basic fact, Purolator's point of error is overruled.

### SUFFICIENCY OF THE EVIDENCE TO SUPPORT THE CONCLUSIONS OF LAW RELATING TO PUBLIC NECESSITY AND INADEQUATE SERVICES AND FACILITIES

The next point of error raised by Purolator is as follows:

The Commission's Final Order is not based on substantial evidence that there exists a public necessity for granting the application, nor that the existing facilities and services are inadequate.

Under the terms of art. 911b, § 5a(d), the Commission possesses no authority to issue a certificate of convenience and necessity unless the agency's conclusions of law, relative to public necessity, the inadequacy of existing carriers' services and facilities, and the promotion of the public convenience, are "based on substantial evidence." This requirement is reinforced by the provisions of the Texas Administrative Procedure and Texas Register Act (APTRA), Tex.Rev.Civ. Stat.Ann. art. 6252–13a, § 19 when judicial review is conducted under the substantial evidence rule, as in the present case.

■ We observe that the phrasing of Purolator's point of error constitutes a claim that the Commission's order is not based on substantial evidence in two *conclusions of law* or findings of ultimate fact. In determining whether there is "substantial evidence" to support a given factual proposition, we are required to consider the evidence "taken as a whole." *Railroad Commission of Texas v. Continental Bus System,* 616 S.W.2d 179, 183 (Tex.1981). Accordingly, when the factual proposition attacked is a finding of *ultimate* fact made by the agency, asserted to be unsupported by "substantial evidence," we would be required to examine *every* finding of basic fact and *every* finding of intermediate fact relating to the finding of ultimate fact in order to determine in a rational way whether *they* are supported by substantial evidence. We may not perform that kind of judicial review for the reasons pointed out in *Charter Medical-Dallas, Inc. v. Texas Health Facilities Commission, supra.* We therefore will attempt to evaluate Purolator's point of error in the only way logic permits, that is, by examination of its brief to ascertain what specific findings of *basic* fact it expressly contends are not supported by substantial evidence. (We have reviewed previously the inferences or ulti-

mate facts drawn by the Commission from its findings of basic fact.)

■ Under the point of error we now consider, Purolator argues specifically that "not one witness from the non-bank public appeared in behalf of this application" and "the mere expression of a preference or a desire for a new carrier is not sufficient to establish the public need for that service." The harm and relevance of the proposition first stated is not suggested to us by Purolator, nor is it suggested that some affirmative rule of law was violated in the proceedings or that the testimony of witnesses unrelated to the banking business was essential in some respect to any issue in the proceeding. The Commission's findings of basic fact, which logically relate to the need for a new carrier, are not all expressed as a mere "desire" by shippers in the disputed area for new service. While a few of the relevant findings of basic fact do skirt somewhat near to being mere summaries of the testimony, we conclude they are sufficient in their wording to be considered declarative of the basic facts as the Commission found them to be. Only two of them suggest that the "desire" or "preference" of a shipper was material: that Purolator's present system of scheduled routes and stops meets the "desires" of the Federal Reserve Bank at Dallas; and that the "desire" of two banks for more frequent service was rejected by Purolator, the word "desire" being used in the sense of a request made of Purolator by the two banks. Most importantly, it is plain that *controlling effect* was not given to these two findings, among the many made by the Commission, and that is the vice condemned by *Plantation Foods, Inc. v. Railroad Commission of Texas,* 480 S.W.2d 508, 510 (Tex.Civ.App. 1972, no writ).

Finally, Purolator argues that the Commission "ignored" the testimony of one of the witnesses called by Purolator. We treat Purolator's argument to be one to the effect that the Commission did not give controlling effect to the witness' testimony, for we have no way of knowing whether the testimony was "ignored" or not. Reso-

lution of any conflicts in the evidence was within the duty and power of the Commission. Purolator does not suggest a finding of basic fact to which the witness' testimony relates or what finding of basic and material fact his testimony established conclusively. We may not say, based upon Purolator's contentions, that the Commission committed reversible error.

We overrule Purolator's point of error attacking the sufficiency of the evidence to support the Commission's conclusions of law relating to public necessity and inadequacy of existing services and facilities.

## SUFFICIENCY OF THE COMMISSION'S FINDINGS OF BASIC FACT TO SUPPORT ITS CONCLUSIONS OF LAW OR FINDINGS OF "ULTIMATE FACT"

We quote in full Purolator's next point of error and the argument thereunder:

The District Court erred in sustaining the Commission's Final Order in that the Commission's Final Order fails not only to meet the requirements of Art. 911b regarding Findings of Fact, the Commission's Final Order also fails to meet the requirements of the Texas Administrative Procedures (sic) Act, in that ultimate Findings of Fact are not supported by underlying Findings of Fact.

Section 16(b) of Article 6252–13a, the Administrative Procedure Act, reads: "A final decision must include findings of fact and conclusions of law, separately stated. Findings of fact, if set forth in statutory language, must be accompanied by a concise and explicit statement of the underlying facts supporting the findings." The Order fails to meet the requirements of Sec. 5a(d) of the Motor Carrier Act regarding explicit Findings of Fact regarding carrier inadequacies and public need for the proposed service. It also fails to meet the above stated requirements of the A.P.A.

We ascertain from the foregoing that Purolator contends that the Commission's conclusions of law, or findings of ultimate fact, relating to public need and the inadequacy of Purolator's existing service and facilities, are not supported by findings of basic fact. We conclude to the contrary, as discussed at length under Purolator's first, second, and third points of error. We overrule the point of error.

## THE COMMISSION'S RELIANCE UPON RATE ISSUES IN AWARDING A CERTIFICATE OF CONVENIENCE AND NECESSITY

■ Purolator assigns as error the Commission's reliance "upon rate issues as the rationale for finding a public need for the proposed service." This point of error refers to the proposition that in several respects the Commission's final order reasons from the premise that rate relief is available in the Commission to prevent ruinous competition and the premise that tariff rates may be a factor in public need and inadequate service when they inhibit the utilization of transportation services of a kind that an existing carrier is authorized to perform at the tariff rates. We have discussed the matter at length above. The logic of the Commission's rationale is apparent to us; we may not say it is unreasonable or that a clear error of judgment was made.

■ The issue remains whether the Commission is legally or positively forbidden in a certificate proceeding to rely in this fashion upon the matter of official or regulated motor carrier rates, which is the gist of Purolator's point of error. We hold that the agency may do so in the circumstances of the present case where the Commission has found, in effect, that the level of rates for non-scheduled services has prevented the use of such services by shippers who need them. *Cf., Railroad Commission of Texas v. Continental Bus System, supra,* at page 183, upholding the Commission's finding of a public need for "faster, minimal-stop service *at ordinary bus fare levels*" in addition to "local" service between the same two points (emphasis supplied); *Apollo Transports, Inc. v. Railroad Commission of Texas,* 610 S.W.2d 872, 875 (Tex.Civ.App. 1981, no writ), acknowledging the rule in

the Interstate Commerce Commission "that the level of rates is a factor to be considered where the applicant shows that existing rates are so unreasonably high as to constitute, in effect, an embargo." The point of error is overruled.

## WHETHER THE COMMISSION'S FINAL ORDER IS "CLEAR AND CONCISE" AND WHETHER IT WAS REQUIRED TO SET FORTH "GEOGRAPHICAL FINDINGS"

■ In two points of error, Purolator contends the Commission's final order is erroneous for the reasons that it is not "clear and concise" and the Commission recites therein no "geographical findings to support" the grant of the application. The area specified in the map accompanying the Wells Fargo application designates the counties of the State wherein Wells Fargo sought authority to operate. Art. 911b, § 5a(c). The Commission's final order designates the counties wherein Wells Fargo is authorized to provide motor transportation service under its certificate. The contested-case proceeding was conducted in reference to these counties. The counties wherein Wells Fargo sought authority to operate is not disputed and Purolator has not suggested that it was misled or otherwise prejudiced by conduct of the proceeding in reference to these counties. We see in these circumstances no necessity for a finding of fact relative to these counties. Finally, we hold the order to be sufficiently "clear and concise" for the purposes of judicial review, for informing the parties of the grounds upon which the order is based, and for demonstrating the Commission's application of the relevant substantive and procedural rules. The points of error are overruled.

Finding no error as assigned by Purolator, we affirm the judgment of the trial court.

Affirmed.

SHANNON, Justice, concurring.

I concur in the affirmance of the judgment of the district court for the reason that the agency record is not properly before this Court for review.