RAILROAD COMMISSION of Texas et al.,
Petitioners,

v.

SHELL OIL COMPANY et al., Respondents.

No. A–9759.

Supreme Court of Texas.

May 27, 1964.

Rehearing Denied July 15, 1964.

———◆———

Waggoner Carr, Atty. Gen. of Texas, Austin, Joseph Trimble and Linward Shivers, Asst. Attys. Gen., for Railroad Commission and others.

Walter R. Koch, Hart & Hart, Houghton Brownlee, Jr., Austin, for C. A. Green & R. J. McMurrey.

R. H. Whilden and James R. Connor, Houston, Dan Moody, Jr., Powell, Rauhut, McGinnis, Reavley & Lochridge, Frank Douglass, Austin, with above firm, Robert J. Stanton and H. D. Bushnell, Tulsa, Okl., C. F. Heidrick and E. M. Cage, Dallas, for Shell Oil Co. and others.

CULVER, Justice.

This suit was brought by Shell Oil Company, Amerada Petroleum Corporation, and Sun Oil Company, challenging the validity of an order of the Railroad Commission prorating the production in four separate oil reservoirs on the Quitman structure in Wood County on the basis of 50% per well and 50% on the acreage assigned to the well. The owners of two separate tracts, C. A. Green and R. J. McMurrey, intervened seeking to have the Commission's order upheld. C. A. Green owns a one-acre tract on which one well was drilled in December, 1960, and McMurrey has a well on a 2.03-acre tract drilled in June of the same year. The district court held that the order was not reasonably supported by substantial evidence and was therefore arbitrary, unreasonable, capricious and confiscatory. Accordingly, the order was set aside and enforcement enjoined. The Court of Civil Appeals affirmed. 369 S.W.2d 363.

Each of the four fields involved in this suit is a separate and distinct hydrocarbon reservoir not in communication with one another or with other reservoirs. All four are located on what is known as the Quitman structure. In accordance with its usual practice the Railroad Commission has assigned to each reservoir a new field designation, and has consistently treated each one as a field separate and distinct from any other on the same structure or elsewhere. These fields are designated as the Southeast Quitman (Kirkland), the Southeast Quitman (Rhodessa), the Southeast Quitman Goldsmith (Kirkland), and the Southeast Quitman Goldsmith (Rhodessa) Fields.

The contention of Shell and the other respondents is that the field proration order fails to protect their correlative rights and results in great uncompensated drainage from their leases to the small tract wells owned by the petitioner-intervenors, depriving them of the reasonable opportunity of producing their fair share of oil from the reservoirs, thus dispossessing them of their property without due process of law. In our opinion these contentions are well taken and we accordingly affirm the decision of the Court of Civil Appeals.

■ The basic position taken by the Commission and the two aligned intervenors is that Shell and the other respondents, in the light of their conduct from the time of the discovery of oil production on the Quitman structure in 1942, are barred by unreasonable delay, laches and estoppel from seeking to have the proration order of the Railroad Commission adjudged null and void. They rely principally upon the

statement made in the Normanna case [1] wherein we said:

> "We are in agreement with the reasoning of the courts in the Humble and Standard Oil Company cases in holding that where producers have acquiesced in and have failed to complain of the Commission's proration orders for a long period, during which time other operators have expended vast sums in exploration and drilling operations, such producers should not be heard to complain."

This statement is not applicable to the facts in this case for there has been on the part of Shell and the other respondents no acquiescence in or failure to complain promptly, much less for a long period of time, of the proration order here under attack. Moreover, the Commission and intervenors do not take issue with the evidence introduced on the trial that the intervenors have already recovered from the wells located on their two small tracts greatly more than the recoverable reserves which originally underlaid those tracts; that each well has returned a net income substantially in excess of its original cost and that any future production would be generated by uncompensated drainage from other tracts.

During the years following the initial discovery in the Quitman area, further development revealed the fact that the subsurface area is divided into a number of separate oil-producing horizons at depths varying from 4200 to 8500 feet. The Railroad Commission has, during the history of oil production from the Quitman structure and prior to the discovery of the fields here involved, adopted field rules providing for an allocation formula of 75% acreage and 25% per well in these various reservoirs or fields where it appeared that there were no tracts entitled to separate development of less than the standard size proration unit of 40 acres; but where there were smaller

tracts within the probable productive limits of a particular reservoir, the Commission adopted a proration formula of 50% acreage, and 50% per well.

There are four of these reservoirs (each considered a separate field) on the Quitman structure for each of which the Railroad Commission had, after due notice and hearing, adopted a 50–50 formula. From none of these orders did Shell or the other respondents appeal, nor did they appeal from the orders fixing the formula in other reservoirs at 25% per well—75% on acreage.

The four fields dealt with here were discovered in the latter part of 1959 and in January and February of 1960. After the expiration of the discovery allowable period, the Commission took under consideration the matter of adopting field rules for these reservoirs. Hearings and rehearings were conducted but no final order was entered until June of 1962 which provided that in each field the allocation of allowables should be on the basis of 50% per well and 50% on assigned acreage. Within the 15-day period allowed by the rules of the Commission, Shell and the other respondents duly filed motions for rehearing asking that the Commission rescind the 50–50 allocation formula and adopt as a part of the field rules applicable to each of these four fields an allocation formula which they alleged would afford to them, and to all others so interested, a reasonable opportunity to recover their fair share of the hydrocarbons in the fields. On July 18, 1962, those motions were denied by the Commission. This suit was filed thereafter on August 8, 1962.

Intervenors argue that since respondents had not appealed from the orders affecting other reservoirs or fields in the Quitman area but had in fact recommended to the Commission in some instances the formula that was subsequently adopted, their wells were drilled on the justified belief that the

1. Atlantic Refining Co. v. Railroad Commission, 162 Tex. 274, 346 S.W.2d 801.

50–50 formula would be adopted in these newly discovered fields. This does not follow at all. If petitioners were correct then obviously there would have been no point in holding the several hearings conducted by the Commission in order to determine what rules should be adopted. It certainly was not a foregone conclusion that the Commission would necessarily adopt the same formula that it had in the past for other fields. It cannot be logically said that Shell's right to appeal promptly from the first orders affecting newly discovered fields would be foreclosed, which orders. were thought to be unjust and not based on substantial evidence. The fact is that Shell and the others acted with due diligence. Under the Commission's rules of procedure Shell and the other respondents moved promptly ·to request hearings and rehearings and, when hearings were called and set by the Commission, Shell timely presented evidence to show the foreseeable injury that would be imposed upon it by the proposed 50–50 allocation and urged the adoption of what they deemed to be a more equitable formula.

■ We recently held that the law contemplates that the Railroad Commission will treat and regulate reservoirs separately, which are physically separate and not connected, even though they may underlie the same tract of land. Benz-Stoddard et al. v. Aluminum Company of America, Tex., 368 S.W.2d 94. The contention of petitioners would be at variance with this rule of separate reservoirs. The rights of the parties are to be determined on the basis of what the facts are and what has occurred in respect to the field under consideration and not what has previously taken place in other fields although they may be located nearby and possess similar characteristics in some respects.

■ Since Shell and the other respondents cannot be charged with unreasonable delay or laches, the facts here bring this case squarely within the purview of the principal holding in Normanna. We there

held invalid the proration order adopted by the Commission which would allow a well on a .3-acre tract to produce at a rate many times greater per acre than one drilled on the standard unit of 320 acres. We said the evidence did not justify such a wide discrepancy; the order did not come close to compelling ratable production nor did it afford each producer in the field a fair chance to recover his proportionate share of the hydrocarbons in the reservoir.

Here the Green one-acre tract was shown to have had originally recoverable reserves of about 9,000 barrels of oil but the well thereon had produced some 40,000 barrels prior to June 1, 1962. Under the 50–50 formula it was estimated that from this well in the future the owner would recover approximately 130,000 barrels which would necessarily be drained from under other tracts lying within the productive area. Substantially the same facts exist with respect to the McMurray two-acre tract. The evidence further shows without dispute that from 80 to 90% of this uncompensated drainage will flow from the tracts leased by Shell and the other respondents. The conclusions reached in Normanna are equally applicable to these facts.

■ It is now well settled that the Railroad Commission is vested with the power and charged with the duty of regulating the production of oil and gas for the prevention of waste as well as for the protection of correlative rights. Marrs v. Railroad Commission, 142 Tex. 293, 177 S.W.2d 941; Gulf Land Co. v. Atlantic Refining Co., 134 Tex. 59, 131 S.W.2d 73; Atlantic Refining Co. v. Railroad Commission, 162 Tex. 274, 346 S.W.2d 801; Halbouty v. Railroad Commission, Tex., 357 S.W.2d 364.

■ Petitioners offered in evidence the transcript of the written testimony given by Shell at the hearing by the Railroad Commission to consider the adoption of field rules for the Quitman Northwest (Kirkland Field), for the purpose, they say, of showing what Shell Oil Company thought

about the fairness and reasonableness of a 50% well allocation formula as applied to a Kirkland reservoir in all respects substantially identical in physical characteristics and production mechanism to the two Kirkland reservoirs which are involved in this suit. The trial court did not err in excluding this testimony. As said earlier this evidence would not tend to establish the asserted defenses of laches and unreasonable delay in so far as the fields herein involved are concerned. In the Quitman Northwest (Kirkland) there were 12 wells, each located on the standard unit of 40 acres, one well on 36.5 acres and one well on the smallest tract in that reservoir, namely, 34.3 acres. There could be little complaint of drainage made in this field no matter what formula might have been adopted since all of the drilling tracts were of approximately the same size.

The intervenors, Green and McMurrey, assert that none of the respondents have made to them any offers to pool their tracts which would have afforded them a fair chance to recover the oil in the reservoirs beneath their tracts. They urge that under a statement made in Halbouty v. Railroad Commission, Tex., 357 S.W.2d 364, in the absence of a fair pooling offer, the Railroad Commission should allow the holder of a Rule 37 permit to recover a sufficient amount of oil or gas to repay drilling and production costs, plus a reasonable profit. That contention, whether valid or not, is immaterial here because these parties have already recovered a net income substantially in excess of their original drilling costs.

Petitioners argue that if the Commission were to impose a 100% acreage allocation formula in these reservoirs neither of their wells would be able to produce a sufficient amount of oil to pay current operating expenses so there would be no alternative to the abandonment of these wells. As to that we say that the issue here drawn is not whether the 50–50 or 100% acreage formula be adopted. The evidence does not show that any formula short of the 50–50 pro-

ration order would not produce a sufficient amount of oil to pay intervenors their operating expenses and compel a shut down and an abandonment of their wells.

The right of a landowner to a permit to drill on his tract no matter how small, as an exception to Rule 37, is predicated on the premise that he is entitled to a fair chance to recover the oil and gas in and under his land or the equivalent thereof and to prevent confiscation of his property. Railroad Commission v. Williams, Tex., 356 S.W.2d 131. But in determining the validity of a field-wide proration order the landowner is not wholly restricted to a recovery of the amount of reserves underlying his land. The test in that case is whether he has an opportunity to produce his fair share of the gas in the reservoir. See Atlantic Refining Co. v. Railroad Commission, Tex., 346 S.W.2d 801. Article 6008, Section 10, declares as a matter of policy that the statute is enacted for the protection of public and private interests by prohibiting waste and compelling ratable production. Section 10 imposes upon the Commission the duty to prorate and regulate production from each common reservoir so as to prevent waste and adjust correlative rights. Section 13 sets forth a number of factors that the Commission shall take into account in determining the daily allowable production, and Section 22 vests in the Commission a broad discretion in the administering of this comprehensive regulatory act.

We also said in Benz-Stoddard, supra:

"'* * * This right to control the rate of flow in order to prevent waste also enables the commission to offset the advantage obtained by one who is given an exception to the spacing rule by limiting his allowable production to the extent necessary to overcome this advantage. * * *.'"

We do say that the 50–50 formula results in the uncompensated drainage of an unreasonable amount of oil from beneath respondents' tracts, thus preventing them

from a fair chance to recover their proportionate share in the reservoir. The order adopting that formula is not supported by substantial evidence. The Commission is not enjoined from adopting any formula which provides less than a 50% well factor and which in its judgment and discretion would be more nearly equitable to all parties.

The judgments of the courts below are affirmed.