**RAILROAD COMMISSION of Texas et al., Appellants,**

v.

**GRAFORD OIL CORPORATION et al., Appellees.**

**No. B–6537.**

Supreme Court of Texas.

Nov. 9, 1977.

Rehearing Denied Dec. 7, 1977.

---

John L. Hill, Atty. Gen., Linward P. Shivers, Asst. Atty. Gen., Austin, Clark, Thomas, Winters & Shapiro, Barr McClellan, John Coates and Barry Bishop, Austin, for appellants.

Graves, Dougherty, Hearon, Moody & Garwood, Dan Moody, Jr., and Robert C. Grable, Austin, Hart & Hart, James P. Hart, Austin, for appellees.

GREENHILL, Chief Justice.

This is a direct appeal by Mitchell Energy Corporation and the Railroad Commission from a trial court judgment declaring an order of the Railroad Commission to be invalid and permanently enjoining the Commission from putting the order into effect.

The Railroad Commission's order consolidated nine gas fields [1] into one field, and it promulgated spacing and production [proration] rules applicable to the consolidated field. The effect of the order was to treat the consolidated area as if it were a single, continuous reservoir. The order was opposed by Graford Oil Corporation and certain owners of unleased land.

After entertaining their actions and hearing the claims of the parties, the district court declared this order invalid on the three grounds: (1) the order did not contain a fact finding as required by statute, that the hydrocarbons it affected constitute a common reservoir; (2) there was not substantial evidence to support such a finding had it been made; and (3) the owners of unleased land in the affected area were denied due process because they were not given an opportunity to introduce evidence or to participate in a hearing before the Commission. We affirm the judgment of the trial court on all three grounds.

## I.

Mitchell Energy Corporation [Mitchell] initiated this action in December of 1975,

---

1. The gas fields in question consist of seven entire fields and portions of two others, but for convenience we shall refer to the order as consolidating nine entire fields.

when it applied to the Commission for the consolidation of seven gas fields in Palo Pinto County. Later, two gas fields in Jack County were included in the application, bringing the total area of the lands in question to approximately 45,000 acres. The field rules for three of the fields proposed to be consolidated provided for 320-acre proration units, and production allocation was based on one hundred percent of acreage. The spacing rules applicable to the other six fields allowed wells to be drilled on twenty-acre tracts, but limited production of these wells to twenty-five percent of the potential capacity of the well without regard to acreage.

Notice of Mitchell's application was sent to the operators of record on the affected land, but notice was not given to persons who owned unleased land in the affected area. Approximately seventy-five such owners later intervened in the case, and they are referred to here as the McClure group.

On July 12, 1976, the Commission followed the examiners' recommendation and ordered the consolidation of the nine gas fields. The McClure group then filed their petition in intervention; and with Graford Oil Corporation [Graford Oil], they appealed to the district court. That court set aside the consolidation order and remanded the cause to the Commission for "further proceedings" because the Commission's order contained no findings of fact or conclusions of law as required by the Administrative Procedure and Texas Register Act Section 16(b).[2]

On remand, Graford Oil and the McClure group filed motions before the Commission to reopen the hearing and to allow the admission of additional evidence. Instead of granting these motions and conducting further proceedings, the Commission overruled the motions and issued a new order of consolidation which incorporated by reference the hearing examiners' findings of fact and conclusions of law. In all other material respects, the new order was identical to the previous order of consolidation.

Graford Oil and the McClure group then made a second appeal to the district court. This time the district court held the Commission order invalid on grounds that there was no finding that all of the hydrocarbon accumulations encompassed by the order constituted a "common reservoir;" that there was not substantial evidence to support such a finding had it been made; and that the Commission failed to accord the McClure group due process. The trial court ruled against the Commission, and the Commission and Mitchell then brought this direct appeal to us. They contest the trial court's conclusions on the meaning of "common reservoir" within Article 6008, Section 2; the significance of the hearing examiner's findings of fact; and the sufficiency of the due process given to the owners of unleased lands by the Railroad Commission.

■ The parties agree on the controlling questions, and they agree that the basis of the Railroad Commission's authority to regulate the production in natural gas fields is set out in Article 6008, Section 10. That statute authorizes the Commission to prorate and to regulate, the daily gas production from "each *common reservoir*" in order to prevent waste or to adjust correlative rights.[3] It does *not*, however, autho-

---

2. Article 6252–13a Section 16(b). The Act will hereinafter be referred to as the Administrative Procedure Act, or the A.P.A. Statutory references are to Vernon's Texas Civil Statutes Annotated.

3. Article 6008 Section 10 provides:
   It shall be the duty of the Commission to prorate and regulate the daily gas well production from each common reservoir in the man-

ner and method herein set forth. The Commission shall prorate and regulate such production for the protection of public and private interest:
   (a) In the prevention of waste as "waste" is defined herein;
   (b) In the adjustment of correlative rights and opportunities of each owner of gas in a common reservoir to produce and use or sell such gas as permitted in this Article.

rize the Commission simply to combine several common reservoirs into a single field for proration purposes for administrative convenience. *See Railroad Commission v. Shell Oil Co.*, 380 S.W.2d 556, 559 (Tex. 1964); *Benz-Stoddard v. Aluminum Co. of America*, 368 S.W.2d 94 (Tex.1963).

■ Since the Commission must prorate as a separate field each common reservoir, the question here turns upon the construction given to the critical term "common reservoir." Article 6008, Section 2 defines a common reservoir as meaning:

> . . . any oil and/or gas field or part thereof which comprises and includes any area which is underlaid, or which from geological or other scientific data or experiments or from drilling operations or other evidence appears to be underlaid by a common pool or accumulation of oil/or gas . . . .

The statute can be read two ways.

The Commission and Mitchell Energy read this definition to mean that an area is a common reservoir if it "appears to be underlaid by a common pool or [by an] accumulation of oil and/or gas." Graford Oil and the McClure group, on the other hand, read the statute as requiring that the area "be underlaid by a common pool or [by a common] accumulation of oil and/or gas." We agree with the latter reading of the statute in which "common" modifies both "pool" and "accumulation;" i. e., when it appears that the area "appears to be underlain by a common pool or [a common] accumulation of oil and/or gas."

■ Since we hold that a common reservoir consists of a common pool or a common accumulation of hydrocarbons, separate and distinct pools of oil or gas, which are not connected, and which do not communicate with one another, do not constitute a "common reservoir." Each separate pool or accumulation is, under the statute, a separate reservoir, even though several different reservoirs may underlie a single gas-producing area and an entire gas-producing area may often be loosely referred to as a "field." *See Railroad Commission v. Rio Grande Valley Gas Co.*, 405 S.W.2d 304, 310 (Tex. 1966). Consequently, the consolidation order in this cannot stand unless the consolidated area is found to be a common pool or common accumulation of hydrocarbons.

We now turn to the facts.

## II. FINDINGS OF FACT

■ Section 16(b) of the Administrative Procedure Act, which all parties agree applies to this case, requires that final decisions of administrative bodies include findings of fact and conclusions of law, separately stated.[4] The findings should be such that a court, on reading them, could fairly and reasonably say that they support the ultimate findings of fact required for its decision. *Miller v. Railroad Commission*, 363 S.W.2d 244 (Tex.1963). Thus, when the trial court concluded that the record contained no fact finding that the consolidated area is a common reservoir, it properly held that the Commission's order was invalid since it did not comply with the A.P.A.

The findings of fact the Commission did make regarding the area in question are as follows:

1. That the Atoka Age Conglomerate Formation is generally distributed throughout the area which was the subject of this hearing.

2. That the formation consists of *interspersed sections* of conglomerate and

---

4. Section 16(b) of the A.P.A. provides:

(b) A final decision must include findings of fact and conclusions of law, separately stated. Findings of fact, if set forth in statutory language, must be accompanied by a concise and explicit statement of the underlying facts supporting the findings. If, in accordance with agency rules, a party submitted proposed findings of fact, the decision shall include a ruling on each proposed finding. Parties shall be notified either personally or by mail of any decision or order. On written request, a copy of the decision or order shall be delivered or mailed to any party and to his attorney of record.

shale which form generally correlatable *but not continuous reservoirs* some of which are productive of gas.

3. That the porosity and permeability of the conglomerate formation is such that one well would adequately drain a 320 acre gas reservoir in this formation.

4. The discontinuity of the lenses within the overall reservoir is such that not every well on a 320 acre unit would drain all of the lenses underlying all portions of such unit.

5. That the drilling of a second well on a 320 acre unit might permit the development of lenses not developed by a single well on such unit.

6. That a spacing pattern requiring minimum distances of 660 feet from property lines and 1320 feet between wells subject to exceptions after notice and hearing would be a reasonable spacing pattern for the development of the reservoir.

7. That because of the apparent correlation and apparent merging of the various lenses within the Atoka Conglomerate Section, the entire section can be reasonably developed as a single reservoir.

■ The Commission and Mitchell argue that fact findings numbers 1, 3, and 7 support the conclusion that the Atoka formation is a common reservoir. We do not agree. The first finding merely states that the geological *formation*, productive or not, extends throughout the affected area; and the seventh finding merely states the Commission's conclusion that the entire formation can be developed *as if it were* a common reservoir. Finding number 3 merely recognizes that a 320-acre reservoir in the formation would be drained by a single well.

■ The other findings show, however, that the Atoka formation is in fact composed of several different reservoirs. Finding number 2 recognizes the existence of non-continuous reservoirs throughout the formation. Finding number 4 affirmatively states that the "lenses"[5] within the formation are non-continuous, and finding number 5 recognizes that a single 320-acre tract might be underlain by more than one reservoir. The only reasonable conclusion that we can draw from our reading of the Commission's fact findings and the exhibits in the record is that the Atoka formation consists of several separate "common reservoirs," as that term is defined in Article 6008 Section 2(c). The order consolidating those several reservoirs into one field for proration purposes was, consequently, in violation of Article 6008 Section 10, and was invalid.

The trial court's second holding is that there was not substantial evidence adduced at the Railroad Commission's hearing to support a finding of one common reservoir. The trial court concluded that even if the Commission found the Atoka formation to be a common reservoir, the record did not contain substantial evidence to support such a finding. We agree.

■ Our decision to uphold the trial court's conclusion does not necessarily mean we agree completely with its view of the case. Rather, this court's duty in reviewing decisions on the state of the evidence is not

---

**5.** A "lens" in oil and gas terminology has been defined as:

A relatively porous, permeable, irregularly shaped, sedimentary deposit surrounded by impervious rock. The lens may serve as a local center of concentration of oil in the formation. A lenticular sedimentary bed that pinches out in all directions.

And a "lenticular reservoir" has been defined as:

A lens of porous and permeable sediments surrounded by strata of low permeability, often shale. There may be a number of such lens unconnected with each other in an area. Such reservoirs are often small, but completely saturated with oil or gas. The shoestring sands of the mid-continent region are notable examples of lenticular reservoirs.

7 Williams & Meyers, *Oil & Gas Law*, Oil & Gas Terms page 318 (1976).

to substitute our judgment for any particular tribunal but to insure that the initial decision was based on "substantial evidence" and that this decision has been given the appropriate review. Article 6252–13a, §§ 19(e)(3)–(5). Therefore, under the new Administrative Procedure Act, we must test the substantiality of the evidence from the record upon which the Commission made its decision. *Imperial American Resources Fund Inc. v. Railroad Commission*, 557 S.W.2d 280, 284–285 (Tex.1977); *cf.* Hamilton and Jewett, "The Administrative Procedure and Texas Register Act: Contested Cases and Judicial Review," 54 *Tex.L.Rev.* 285, 303–07 (1976).

■ In studying the Commission record, we accept the hearing examiners' report as correctly summarizing the evidence.[6] That report is as follows:

### APPLICANT'S [MITCHELL ENERGY] EVIDENCE

The applicant submitted seven geological exhibits and ten engineering exhibits tending to support the application

Exhibit No. 1 was an area plat indicating the general area covered by the application and including the traces of five cross-sections and a log section indicating the gross interval to be considered and some of the separate producing sections within that interval.

The applicant showed a substantial number of wells in that area either known to be simultaneously completed in more than one of the productive zones or suspected of being completed in more than one zone.

Test data was submitted to indicate that a well would drain a distance of at least 2,500 feet from the wellbore. This information being based on the initial tests of a well drilled 2,500 feet from the nearest well completed in the same reservoir and finding that reservoir to be partially depleted.

### HENDERSON AND ERICKSON EVIDENCE

Henderson and Erickson submitted two exhibits and the testimony of consulting engineer illustrating the lenticularity of the conglomerate reservoirs within the interval proposed for consolidation and indicating that the productive lenses are randomly oriented so that wide spacing would not give an offset operator a reasonable opportunity to complete in the same lens as his adjoining operator.

The witness did not indicate that one well would fail to drain 320 acres if it was in a lens with a 320 acre extent. The witness testified that there were substantial differences in pressures in the various lenses so that the simultaneous development of the lenses might result in inter-lens migration of gas and that a prudent operator would develop the lenses individually because of the pressure differential.

### THE GRAHAM GROUP EVIDENCE

The Graham Group, consisting of six operators, E.C. Johnston, Pitcock, Inc., Morris Stephens, E. Bruce Street, Trumter Petroleum Corporation, Twin Montana, Inc. and Wes-Mor Drilling, Inc., presented three witnesses and eight (8) exhibits.

The evidence tended to show that the lithology of this section is a series of discontinued lenses which although apparently correlative across a substantial area are in fact completely separate and the few, if any, are as large as 350 acres in area.

The geological witness for the group estimated that there were at least 16 sepa-

---

**6.** The statement of facts from the Commission hearing is in proper form, but the papers in the transcript from that agency are not easily found. We suggest that the papers in agency transcripts be numbered consecutively and that the transcript include an index indicating the nature of the papers in the transcript and the page numbers where those papers may be found.

rate reservoirs within the area of his cross-section and that they could be developed only by closely spaced wells.

The witness testified that the wells were drilled on acreage ranging from 80 to 320 acres and stated that in his opinion a 160 acre basic unit with an 80 acre option would be a preferable development pattern for the area.

Mitchell's exhibit number four and the testimony of its expert before the Commission clearly show that the Atoka Conglomerate is composed of five producing zones and a "stray" interval. Other evidence indicates that the only communication among the vertically-separated producing zones is through well completions in two or more of the zones; i. e., the zones are joined by the wells completed in two or more sands. It is our opinion that separate reservoirs cannot be transformed into one common reservoir as defined by the statute, by the completion of wells in them. The statute is drawn in terms of natural communication between the producing sands.

All of the producing areas in question are both vertically and horizontally separated. No natural communication occurs. Indeed, the evidence shows clearly that the Atoka formation is made up of several distinct reservoirs which are not connected with one another. We therefore conclude that the record lacks substantial evidence that these accumulations constitute a common reservoir. Since there is not substantial evidence to support a finding that the Atoka Conglomerate is a single gas-producing formation continuous throughout the consolidated area, the Commission's order cannot stand, even if such a finding had been made.

### III. DUE PROCESS: NOTICE TO OWNERS OF NON–LEASED LANDS

■ The Fourteenth Amendment of the United States Constitution and Article I, Section 19 of the Texas Constitution provide that a person cannot be deprived of life, liberty or property without due process of law. Due process clearly attaches to the type of vested property rights such as the McClure group, the owners of unleased lands, now possess in their mineral estates. *Brown v. Humble Oil & Refining Co.*, 126 Tex. 296, 83 S.W.2d 935, 944 (1935). Consequently, the Commission cannot adjudicate rights in those interests without first offering them some kind of hearing. *Wolff v. McDonnell*, 418 U.S. 539, 557–58, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Steddum v. Kirby Lumber Co.*, 110 Tex. 513, 221 S.W. 920, 921 (1920). *See* F. Cooper, 1 *State Administrative Law* 141 (1965).

The question of notice is not before us. The McClure group obviously had some sort of notice, or knowledge of the action pending before the Commission because they asked to be heard by the Commission. It is not necessary, therefore, for us to pass upon any notice requirement.

■ We do have before us, and we do hold, that owners of unleased lands, whose interests would be materially affected, had a right to be heard at the Commission level. On this question, the Commission and Mitchell have contended that the owners of unleased land are amply protected, as to due process, because they can go to court under the A.P.A., Section 19. That section provides that parties have a right to judicial review and have a right to present additional evidence in court.

We cannot accept the contention that Section 19 of the A.P.A. affords the owners of unleased lands sufficient due process. If they must wait until they are aggrieved by a Commission's order before asserting their due process rights under Section 19, they will have effectively been denied an opportunity to be heard at the real decision making level; i. e., before the Commission. Attacking the Commission's order by intervention in court, after the matter has been decided by the Commission, offers them little help because all the court can do is

uphold, or vacate, the Commission's order. It cannot substitute its judgment for that of the Commission or rewrite the order in any respect. Consequently, we hold that procedural due process requires that these owners of unleased lands, whose substantial property rights were being disposed of, or materially affected by the Commission's order, were entitled to be heard in their own right apart from those representing the operating interests in the hearings before the Commission.

In the alternative, Mitchell and the Commission contend that even if the McClure group is entitled to certain due process procedural protections such as the right to intervene prior to the issuance of the Commission's orders, the failure of the Commission to accord them that right has caused them no real harm in this proceeding. Supposedly their interests were adequately represented at the Commission's hearings by the operators of record in the affected area who were given express notice and an opportunity to oppose the action. Such representation and the right to intervene on appeal, according to Mitchell and the Commission, are sufficient to comply with existing constitutional and policy requirements set by courts for commission action. We do not agree.

■ The testimony of J. D. McClure in the trial court bears out the need and usefulness of separate representation and participation for owners of unleased land in Commission proceedings. His testimony reflects that the Commission's orders for the Atoka formation would hamper his efforts to lease his land, and would reduce the royalties he would receive from production once leased. Therefore, as he is threatened with loss of property rights, which are not the same as the operators' in the area; he, and others similarly situated, are entitled to invoke the procedural protection of due process. In cases like this one, that protection means that the McClure group had a right to intervene and to participate in the Commission's hearings whenever the determinations made at those hearings will affect their interests differently from the interests of other parties to the proceedings.

The judgment of the trial court is affirmed.