TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-02-00352-CV







Seagull Energy E & P, Inc., Appellant


v.


Railroad Commission of Texas, Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT

NO. GN101433, HONORABLE F. SCOTT McCOWN, JUDGE PRESIDING






O P I N I O N


 This case is an appeal from a Railroad Commission ("the Commission") order
denying an exception to the well spacing and density field rules in the Waskom (Cotton Valley)
Field. See Tex. Gov't Code Ann. § 2001.174 (West 2000). Seagull Energy E & P, Inc. ("Seagull")
chose to shut in its gas well, which produced from only one of three gas deposits underlying its lease,
and drill a second well it hoped would reach all three deposits. When the second well was unable
to produce gas from the deposit in which the first well had been completed, Seagull applied for a
spacing and density exception in an attempt to operate both wells simultaneously. See 16 Tex.
Admin. Code §§ 3.37, .38 (2002) (Tex. R.R. Comm'n, Statewide Spacing Rule, Well Densities). 
The Commission denied the application. Seagull appealed to a Travis County district court, arguing
that the Commission did not have the power to consider three gas deposits, not in natural pressure
connection, as a single reservoir for spacing and density purposes. Therefore, Seagull contends that
it was as a matter of law entitled to produce from at least one well completed in each separate
reservoir. The district court affirmed the Commission's order, reasoning that the Commission's
actions fell within its power to regulate natural gas production. We agree with that determination
and will affirm.


BACKGROUND

 Seagull holds the 115.64-acre Albert Davis Lease ("Seagull's lease"), which lies in
the Waskom (Cotton Valley) Field. The Waskom (Cotton Valley) Field has been active for more
than 46 years. (1) It is composed of "lenticular sands"; in other words, there are multiple natural gas
accumulations contained throughout an area with a roughly uniform geologic makeup. (2)

 The location of oil and gas wells is usually determined according to the statewide
rules on well spacing and density. See 16 Tex. Admin. Code §§ 3.37, .38. Spacing rules control the
distance between wells that are drilled into the same oil or gas accumulation at the same depth. Id.
§ 3.37(k). Density rules establish the minimum number of acres allocated to each drilled well. 
Exceptions to either set of rules are to be granted when necessary to prevent either hydrocarbon
waste or property confiscation. See id. § 3.37(a)(1). Each landowner or leaseholder, (3) in order to
have a fair chance at recovering the oil and gas beneath a given lease, has a right to the opportunity
to drill at least one well on the property. Elliff v. Texon Drilling Co., 210 S.W.2d 558, 562 (Tex.
1948).

 When the Commission designates a "field," it may establish "field rules" for that area
which supersede the general spacing requirements, taking into account the particular geologic
makeup of the producing land. (4) Leaseholders, however, are still entitled to drill a well if they meet
the requirements for an exception to the state-wide rules. See Tex. Admin. Code § 3.37(a)(1). The
field rules for the Waskom (Cotton Valley) Field require that wells be spaced so that no more than
one well exists per 80 acres. Furthermore, a well must be located at least 660 feet from the nearest
lease or property line and 1,320 feet from the nearest well on the same lease completed in the same
field. 

 Seagull has been producing gas from its lease since 1974. In 1991, Seagull completed
a new well, designated "Well #1," which produced only from the "C" sand. However, several other
gas deposits underlay Seagull's lease. In June 2000, Seagull voluntarily shut in (5) Well #1 to be able
to drill a second well, "Well # 4." Because Well #4 would only be 1,200 feet away from Well #1,
and the two wells were to be located on fewer than 160 acres, drilling Well #4 while Well #1 was
in production would have violated the field rules. Seagull intended for Well #4 to produce gas from
the C sand while also producing from two other deposits, the "Stroud" and "Taylor" sands. 
However, Well #4 was unable to produce gas from the C sand. Well #4 did, however, produce gas
from the Taylor and Stroud sands. Thus, Seagull found itself with one well producing gas from the
Taylor and Stroud sands and a second, shut-in well capable of producing gas from the C sand.

 Hoping to be able to produce from all three sands simultaneously, Seagull applied for
a spacing and density exception. The Commission set the application for a contested case hearing,
during which the application was contested by a well operator on an adjacent lease. The hearing
examiners, in their proposal for decision, recommended that the Commission deny Seagull's
application because Seagull had not met its burden of proof in applying for the spacing and density
exceptions. The Commission accepted the examiners' findings and denied the application.

 Seagull sought review of the Commission's final order in a Travis County district
court. At trial, Seagull took the position that the Commission had to treat each separate sand as a
separate reservoir when deciding whether to allow simultaneous production from the two wells. The
trial court affirmed the Commission's decision, and Seagull appealed to this Court. 

 Relying on Benz-Stoddard v. Aluminum Co. of America, 368 S.W.2d 94 (Tex. 1963),
and its progeny, Seagull argues that, while the relevant statutory language gives the Commission
power to group lenticular sands from which oil or gas is commingled for pooling and prorationing
purposes, the Commission does not have the statutory authority to disregard Seagull's property
interest in the C sand by treating the three disconnected sands as a common reservoir for spacing and
density purposes. Therefore, Seagull believes that as a matter of right it should be entitled to
produce gas simultaneously from both Well #1 and Well #4; any other result, it contends, would
deny it the right to drill a "first well" into each separate "reservoir" underlying Seagull's lease. The
Commission, citing Railroad Commission v. Pend Oreille Oil & Gas Co., 817 S.W.2d 36 (Tex.
1991), replies that, although some cases appear to support Seagull's contentions, they have been
limited by amendments made to the Natural Resources Code ("the Code") in 1979 and 1981;
according to the Commission, those amendments give the Commission broad authority to regulate
the production of gas for which a commingled production permit has been issued. See Tex. Nat. Res.
Code Ann. §§ 86.012(b), .081(b) (West 2001).


DISCUSSION

 The unique facts of this case make it one of first impression. Seagull has requested
permission, under a rule that regulates the location of wells, to produce natural gas from a well that
has previously been drilled, then shut in. Thus, we are not asked to decide whether Seagull has a
right to drill on its property, but whether it has a right to produce simultaneously from two natural
gas wells that have already been drilled. (6) Both sides concede that no authority exists directly on
point. Seagull asks us to remand for further proceedings on the grounds that the Commission has
prejudiced Seagull's substantial rights and violated the constitution, and that the Commission's
actions are outside the scope of its statutory authority. See Tex. Gov't Code Ann. § 2001.174 (West
2000). 

 An administrative agency has only the powers conferred upon it in clear and
unmistakable language. Public Util. Comm'n v. City Public Servs. Bd., 53 S.W.3d 310, 315-16 (Tex.
2001) (citing Humble Oil & Refining Co. v. Railroad Comm'n, 128 S.W.2d 9, 15 (Tex. 1939)). 
When the Legislature expressly confers a power on an agency, it also impliedly intends that the
agency have whatever powers are reasonably necessary to fulfill its express functions or duties. 
Public Util. Comm'n v. GTE-Southwest, Inc., 901 S.W.2d 401, 407 (Tex. 1995); Kawasaki Motors
v. Motor Vehicle Comm'n, 855 S.W.2d 792, 797 (Tex. App.--Austin 1993, no writ). An agency
may not, however, exercise what is effectively a new power or a power contradictory to the statute
on the theory that such an exercise will be expedient for the agency's purposes. GTE-Southwest, 901
S.W.2d at 407; Sexton v. Mount Olivet Cemetery Ass'n, 720 S.W.2d 129, 137-38 (Tex.
App.--Austin 1986, writ ref'd n.r.e.). Our task, then, is to determine whether the language of the
Code gives the Commission authority to prohibit Seagull from producing natural gas from both of
its two wells simultaneously.

 The Commission has been granted its authority against the background of the
common law. See, e.g., Ryan Consol.Petroleum Corp. v. Pickens, 285 S.W.2d 201, 208 (Tex. 1955). 
A Texas landowner owns the oil and gas beneath the surface of his lease. See Railroad Comm'n v.
Rowan & Nichols Oil Co., 310 U.S. 573, 579 (1940). At the same time, under the "rule of capture,"
a landowner has legal title over all gas that he drains from any well located on his land. Id. In
general, this principle has been interpreted to give each landowner the right to drill a "first well" on
his property, see Gulf Land Co. v. Atlantic Ref. Co., 131 S.W.2d 73, 80 (1939), even though it might
otherwise violate the Commission's spacing and density rules. See Tex. Admin. Code § 3.37(a)(1). 
However, production from such wells is always subject to the Commission's authority to prorate
production and adjust the amount of oil or gas produced by each landowner. (7) See, e.g., Benz-Stoddard, 368 S.W.2d at 98. Thus, the right to drill is balanced against the interests of all the other
landowners in an area not to have the oil and gas reserves depleted through inappropriate waste and
overproduction. See Texaco, Inc. v. Railroad Comm'n, 583 S.W.2d 307, 310 (Tex. 1979); Exxon
Corp. v. Railroad Comm'n, 993 S.W.2d 704, 709-10 (Tex. App.--Austin 1999, no pet.). A
landowner's property right in the oil and gas beneath a tract only exists in light of the Commission's
rules promulgated under the conservation laws. Musick v. Railroad Comm'n of Tex., 747 S.W.2d
892, 896 (Tex. App.--Austin 1988, writ denied). Therefore, Seagull's claims, whether based on
constitutional, property right, or administrative procedure grounds, depend on our interpretation of
the Commission's statutory authority.

 Seagull contends that the sections of the Code giving the Commission authority to
treat discrete gas deposits as a single pool or common reservoir apply only to the Commission's
power to issue prorationing and forced pooling orders. Seagull bases this contention on its
understanding of the history of the 1979 and 1981 amendments, contending that the Code guarantees
a right to a separate well in each separate gas accumulation underlying the lease to every mineral
leaseholder. For Seagull's purposes, the narrative begins in 1963 with the supreme court's decision
in Benz-Stoddard v. Aluminum Co. of America. That case involved a dispute between the owner on
a relatively small lease, Claire Benz-Stoddard, and the holder of larger adjacent leases, Aluminum
Company of America ("ALCOA"). Benz-Stoddard's tract overlaid ten vertically separated gas
"reservoirs or horizons." (8) Benz-Stoddard, 368 S.W.2d at 96. Under a permit issued by the
Commission, Benz-Stoddard drilled a single wellbore from which she connected with three out of
the ten accumulations. The multiple completions allowed her to recover more than seven times the
gas actually in place beneath her tract.

 ALCOA challenged the Commission's order allowing multiple completions on the
grounds that, under the applicable prorationing scheme, Benz-Stoddard would have been able to
recover all of her share of the natural gas resources below her land by completing a well in only one
of the gas accumulations. This Court agreed with ALCOA and overturned the Commission's order,
holding that the statute did not entitle landowners to multiple well completions so long as a well
drilled into any one of the accumulations provided sufficient natural gas to protect the landowners'
property interests. Aluminum Co. of America v. Benz-Stoddard, 357 S.W.2d 809, 811 (Tex.
App.--Austin 1962, writ granted). The Texas Supreme Court reversed, stating that the Commission
was correct in treating the several accumulations separately for the purposes of granting an exception
to the statewide spacing rules. Benz-Stoddard, 368 S.W.2d at 97.

 The supreme court based its conclusion on a statutory provision stating that multiple
completions made through a single borehole shall each be regarded as a separate well. Id.; see Act
of May 1, 1935, 44th Leg., R.S., ch. 120, § 1, 1935 Tex. Gen. Laws 318 (amended 1977) (current
version at Tex. Nat. Res. Code Ann. § 86.003 (West 2001)). (9) Because the statute states that each
separate completion in essence constitutes a separate well, the Commission had authority to treat
each completion as a "first well." Benz-Stoddard, 368 S.W.2d at 97. Following Benz-Stoddard, the
supreme court relied on this analysis to reverse a Commission order applying a uniform prorationing
order to four separate oil fields. Railroad Comm'n v. Shell Oil Co., 380 S.W.2d 556, 559 (Tex.
1964) ("[T]he law contemplates that the Railroad Commission will treat and regulate reservoirs
separately, which are physically separate and not connected, even though they may underlie the same
tract of land."). Similarly, the court overturned Commission orders prorating gas from unconnected
reservoirs in two cases that dealt with prorationing orders issued for the Boonesville Field: (10)
Railroad Commission v. Graford Oil Corp., 557 S.W.2d 946 (Tex. 1977), and Gage v. Railroad
Commission, 582 S.W.2d 410 (Tex. 1979). The Graford court reasoned that, because the
Commission could prorate and regulate gas only in each "common reservoir," the Commission could
only prorate gas in deposits that had been shown to be naturally pressure connected. Graford, 557
S.W.2d at 949-50. Only a fact-finding showing that the consolidated area "is found to be a common
pool or common accumulation of hydrocarbons" would suffice to support a prorationing order
covering that area. Id. at 950. When, in Gage, the Commission again attempted to treat physically
separate reservoirs as a single "common reservoir," the Supreme Court again reversed. "[I]t is
settled," the Gage court wrote, "that separate and distinct 'common reservoirs' cannot be
consolidated into a single field for administrative convenience in prorateing the area." Gage, 582
S.W.2d at 414 (citing Graford, 557 S.W.2d at 950; Shell, 380 S.W.2d at 559; and Benz-Stoddard,
368 S.W.2d at 97).

 The legislature responded to Graford and Gage quickly. As introduced, Senate Bill
257 would have changed the definition of "common reservoir" to include "multiple stratigraphic or
lenticular accumulations of oil or oil and gas, all intervals of which may not be pressure connected." 
Tex. S.B. 257, 66th Leg., R.S. (1979). However, the bill did not pass in this form. As reported, the
final bill only amended sections 85.046 and 86.012 of the Code to add identical subparagraphs
allowing the Commission to permit commingled production from separate natural gas accumulations
based on a finding that such production would "prevent waste, promote conservation, or protect
correlative rights." Act of May 27, 1979, 66th Leg., R.S., ch. 300, 1979 Tex. Gen. Laws 673 (current
version at Tex. Nat. Res. Code Ann. §§ 85.046(b), 86.012(b) (West 2001)).

 Again in 1981, the legislature attempted to expand the definition of "common
reservoir" to include gas reservoirs "whether or not the intervals of the formation or sequence are
pressure connected." Tex. S.B. 1146, 67th Leg., R.S. (1981). Instead, the legislature enacted a
provision stating that, when the Commission permits commingled production from non-connected
gas deposits, it has the power to "prorate, allocate, and regulate" production "as if they were a single
common reservoir." Act of June 16, 1981, 67th leg., R.S., ch. 688, § 3, 1981 Tex. Gen. Laws 2578
(codified at Tex. Nat. Res. Code Ann. § 86.081(b) (West 2001)) (emphasis added). Although the
1981 amendment failed once again to expand the statutory definition of "common reservoir," this
Court has observed that it clearly overturned Graford and Gage. See Railroad Comm'n v. Mote Res.,
645 S.W.2d 639, 644 (Tex. App.--Austin 1983, no writ).

 Seagull disputes the effect on Graford and Gage on the 1981 amendment. According
to Seagull, the fundamental question of the Commission's authority rests in its ability to regulate
each "field" or "common reservoir." For the purpose of interpreting the Commission's authorizing
statute, the statutory definition of both terms, which are usually considered to be synonymous, is that
of a "physically separate" accumulation of gas or oil. See Amarillo Oil Co. v. Energy-Agri Prods.,
Inc., 794 S.W.2d 20, 23-24 (Tex. 1990). (11) According to Seagull, if the three sands do not meet the
definition of "common reservoir," then a rule 37 exception must be granted. Seagull argues that, for
the Commission to promulgate a valid order or field rule, it would first need to establish that all
affected gas accumulations were in natural communication with each other. Seagull concludes that,
because the Commission has not made a finding that the three sands underneath Seagull's lease are
naturally connected the Commission must treat each sand separately by allowing Seagull to produce
from both wells.

 The Commission responds that, under Pend Oreille, it has broad regulatory authority
over gas production when, as here, gas is to be produced in a commingled state. See Railroad
Comm'n v. Pend Oreille Oil & Gas Co., 817 S.W.2d 36, 46 (Tex. 1991). Pend Oreille involved the
Commission's implementation of a forced pooling order under the Mineral Interest Pooling Act. See
Tex. Nat. Res. Code Ann. §§ 102.001-.112 (West 2001). Under that Act, only oil and gas from a
"common reservoir" could be subject to a forced pooling order. Id. In Pend Oreille, the pooled
reservoir comprised two separate gas deposits that had been put into man-made communication
through a common wellbore. Pend Oreille, 817 S.W.2d at 38. The Thirteenth Court of Appeals,
relying on Graford and Gage, held that the Commission lacked authority to treat separate deposits
of gas that are in man-made communication as a common reservoir for pooling purposes. Pend
Oreille Oil & Gas Co. v. Railroad Comm'n, 788 S.W.2d 878, 883 (Tex. App.--Corpus Christi 1990,
writ granted). The Texas Supreme Court reversed. In assessing the scope of the Commission's
authority over commingled gas deposits, the Pend Oreille court analyzed the 1979 and 1981
amendments. The court specifically rejected the argument that the Commission's regulatory
authority over commingled reservoirs did not extend to pooling because the Legislature had "resisted
any interpretation of the term 'common reservoir' that would have limited the commission's
regulatory authority." Id. at 46. After reviewing Graford and Gage, together with the legislative
history of the amendments, the supreme court declared that "the legislature does intend the railroad
commission to have discretion in regulating commingled oil and gas." Id. Hence, the court held that
the terms "prorate, allocate, and regulate," added by the 1981 amendment, "and especially the broad
word 'regulate,' . . . evidence an intention to grant the commission broad authority over gas
production from commingled reservoirs." Id.; Tex. Nat. Res. Code Ann. § 86.081(b).

 Relying on Benz-Stoddard, Seagull attempts to cast this case as resolving the extent
of a leaseholder's right to drill into the separated accumulations of natural gas beneath his lease. (12) 
By contrast, the Commission characterizes this dispute as one concerning the right to produce natural
gas; (13) the right to drill a well has always been subject to the Commission's statutory authority to
control the amount produced from that well in such a way that "no unreasonable hardship need
result." Benz-Stoddard, 368 S.W.2d at 98; see also Shell, 380 S.W.2d at 559. In this case, both Well
#4 and Well #1 have already been drilled. While Seagull argues for a right to drill, in actuality it
seeks the right to produce from both wells simultaneously.

 When a permit for commingled production has been issued, the Commission has
authority to regulate that production. The 1979 and 1981 amendments confer authority on the
Commission in two steps. Under the 1979 amendment, the Commission has authority to issue a
permit for commingled production when it will promote conservation, avoid waste, or protect
correlative rights. Tex. Nat. Res. Code Ann. § 86.012(b). Under the 1981 amendment, the
commission has the power to "regulate" the commingled production from disconnected reservoirs
"as if they were a common reservoir." Id. § 86.081(b). As in Pend Oreille, the technical question
of whether these three gas accumulations actually constitute a natural common reservoir is not
dispositive because, upon granting a permit for commingled production, the Commission gained the
authority to regulate production from the Taylor, Stroud, and C sands as if they were a common
reservoir. Seagull has not challenged the permit allowing it to drill Well #4, which allowed
commingled production. That order contemplated that the three reservoirs would be treated as a
single administrative unit, subject to a showing that such production would promote conservation,
reduce waste, and promote correlative rights. Id. § 86.012(b). Because it made the necessary
findings to authorize commingled production on Seagull's lease, the Commission may now exercise
the regulatory authority given to it by the 1981 amendment regarding all three accumulations.

 Having held that the power given to the Commission by the 1981 amendment applies
to the three commingled lenticular sands, we must still decide whether that power allows the
Commission to restrict gas production from one of two wells drilled into several reservoirs for which
a commingled production permit has been issued. Seagull would have us dismiss Pend Oreille's
broad reading of section 86.081(b) as obiter dictum, applying at most to prorationing and involuntary
pooling orders. We disagree with that assessment. While we grant that Pend Oreille was decided
in the context of the Mineral Interest Pooling Act, the supreme court construed the 1979 and 1981
amendments, and the implication of those amendments for the Commission's power to regulate
natural gas production, as a general matter. Section 86.081 gives the Commission authority to
prorate, allocate, and regulate commingled production of natural gas. Pend Oreille construes the
word "regulate" to give the Commission broad authority, not merely the narrow power to issue
prorationing orders for artificially connected gas reservoirs. This broad reading was appropriate; like
the field in this case, the gas field in Pend Oreille was made up of discontinuous gas accumulations. 
In the type of field involved in these cases, downhole commingling is often the most efficient way
to produce natural gas without causing waste. See Pend Oreille, 817 S.W.2d at 38 n.4 (citing 2
Earnest Smith & Jaqueline Weaver, Texas Law of Oil and Gas § 10.4[C](1) (1st ed.1990)); see also
Gage, 582 S.W.2d at 414 (efficient exploitation of separate gas accumulations in area with lenticular
sands presented "enormous regulatory and technological problems"). The 1981 amendment ensures
that the Commission will have the regulatory tools to manage and conserve these gas reserves. 
Because it is predicated on a finding that it will prevent waste and protect correlative rights, we
believe, as did the supreme court in Pend Oreille, that the power to regulate production embraces
the power to prohibit a leaseholder from producing gas from two different wells simultaneously, so
long as that leaseholder has not proven that hydrocarbons are being drained from his property or
wasted.

 Because we understand the 1979 and 1981 amendments to give the Commission
specific regulatory powers over commingled natural gas production, we hold that, in issuing a permit
for commingled gas production from separate reservoirs, the commission gains authority to exercise
those powers over those reservoirs. Those powers include the authority to restrict production in one
of two wells completed into such a group of reservoirs. Therefore, we overrule Seagull's issue
regarding the scope of the Commission's authority.

 The only remaining question is whether the Commission acted properly in denying
Seagull's application for an exception to the Waskom (Cotton Valley) Field rules on spacing and
density. Although a landowner or leaseholder is entitled to a "first well" on its property, entitling
it to its fair chance to recover oil or gas, a landowner or leaseholder has no right to a second well in
the same common reservoir without demonstrating in a contested case hearing that there is drainage
or waste. See Texaco Producing, Inc. v. Fortson Oil Co., 798 S.W.2d 622, 624 (Tex. App.--Austin
1990, no writ) (producer must demonstrate that reserves underlying his land are being drained and
that he does not have opportunity to offset that drainage to establish injury to his correlative rights
as matter of law). Because the Commission properly treated the separate reservoirs as a single
reservoir for production purposes, Seagull had the burden in the contested case proceeding to
demonstrate that it needed to produce natural gas from Well #1 in order to protect its interests.

 We review the Commission's final orders in contested cases under the "substantial
evidence" test. See Pend Oreille, 817 S.W.2d at 40-41; H.G. Sledge v. Prospective Inv. & Trading,
36 S.W.3d 597, 602 (Tex. App.--Austin 2000, pet. denied). We must ask whether the evidence in
its entirety is sufficient that reasonable minds could have reached the conclusion that the agency
must have reached to justify the disputed action. Texas State Bd. of Dental Exam'rs v. Sizemore, 759
S.W.2d 114, 116 (Tex. 1988); Heat Energy Advanced Tech., Inc. v. West Dallas Coalition, 962
S.W.2d 288, 294-95 (Tex. App.--Austin 1998, pet. denied). The appealing party has the burden to
demonstrate that there was not substantial evidence to support the agency's order. Texas Health
Facilities Comm'n v. Charter Med.--Dallas, Inc., 665 S.W.2d 446, 452 (Tex. 1984). The evidence
in the record may actually preponderate against the agency's decision, but still satisfy the substantial
evidence requirement. Id.

 The Commission's decision was based on evidence provided to it by Seagull. At the
contested case hearing, Seagull presented a calculation of the remaining reserves that could be
reached through Well #1, based on its contention that it had a right to a separate "first well" in the
C sand. This included generalized information about the gas deposits contained in the C sand. 
Seagull's expert stated that, although any analysis of all three sands together would be "highly
interpretative," the three sands, taken together, would produce a volume of approximately 1.7 billion
cubic feet. Seagull also admitted that it had another well on another lease producing gas from the
C sand. All of Seagull's evidence to support a finding of confiscation or drainage sufficient to
support a spacing or density exception is based on the gas reserves in the C sand alone. Instead of
presenting evidence that it was suffering unfair drainage from the three sands taken as a single unit,
Seagull has only provided evidence that it is unable to obtain any gas from the C sand through Well
#4. Having reviewed the administrative record, we believe that there was sufficient evidence for the
Commission to rule as it did. Accordingly, we overrule Seagull's issue.


CONCLUSION

 We have held that, once the Railroad Commission has issued a permit for production
of natural gas from a group of separate lenticular sands for commingled production, it has regulatory
authority to consider those lenticular sands as a single common reservoir for purposes of production
allocation. Accordingly, because the Commission's order was supported by substantial evidence,
we affirm the trial court's decision.



 

 Mack Kidd, Justice

Before Justices Kidd, B. A. Smith and Yeakel

Affirmed

Filed: January 16, 2003
1. The Waskom (Cotton Valley) Field was originally discovered on September 19, 1955, and
the Commission adopted field rules effective November 5, 1956. In 1983, another field, the
Waskom (Cotton Valley, Lo) Field, which had been designated in 1975, was consolidated into the
Waskom (Cotton Valley) Field, and new rules were adopted for the consolidated field. Those rules
have been amended twice since then, in 1985 and 1991.
2. A "lens" is a relatively porous sedimentary deposit surrounded by impervious rock. See
Howard Williams & Charles Meyers, Manual of Oil and Gas Terms 575 (11th ed. 2000). When a
lens is saturated with oil or natural gas, it is described as a "lenticular reservoir." Id. A "sand" is
a deposit of sandstone, a permeable rock in which oil and gas deposits are often found. Id. at 983. 
Thus, the lenticular sands involved in this case are separate sandstone deposits, scattered throughout
the Waskom (Cotton Valley) Field, in which natural gas can be found. Lenticular sands usually
comprise a series of thin gas deposits which would often not be economically feasible to produce
by sinking a separate well into each deposit. See 2 Ernest Smith & Jaqueline Weaver, Texas Law
of Oil and Gas, § 10.4(c)(1) (2d ed. 1998).
3. The holder of a mineral rights lease holds the property rights in the mineral estate as a fee
simple determinable. So long as lease conditions are met, the leaseholder owns the mineral estate. 
See Rogers v. Ricane Enters, 884 S.W.2d 763, 766-7 (Tex. 1994); 1 Smith & Weaver, supra note
2, at § 2.2.
4. The definition of the word "field" is variable; in some instances it refers to a particular
reservoir, and sometimes to an entire geographical area from which oil or gas is produced. Railroad
Comm'n v. Rio Grande Valley Gas Co., 405 S.W.2d 304, 309 (Tex. 1966). For purposes of
interpreting the Natural Resources Code, the Texas Supreme Court has defined a "field" as a gas or
oil deposit that is not in natural pressure connection with any other deposit. See Amarillo Oil v.
Energy-Agri Prods., 794 S.W.2d 20, 23-24 (Tex. 1990). Field rules are special rules that modify the
Commission's well spacing, density, prorationing, and casing requirements for designated fields to
deal with differences in geologic conditions in a geographic area. See 2 Smith & Weaver, supra note
2, § 9.3(c). They do not regulate all physically separate oil and gas accumulations as a whole, but
set the criteria for dealing with each separate common reservoir within the area. See 2 id. § 9.4(c).
5. To "shut in" a well means to close down a producing well voluntarily. See Williams &
Meyers, supra note 2, at 1025. In this case, Seagull placed a concrete plug at the bottom of Well #1.
6. "Drilling" is usually defined as the act of boring a hole through which oil and/or gas may
be produced if encountered in commercial quantities. Williams & Meyers, supra note 2, at 304. 
"Production" is defined either as the act or process of producing oil or gas, or the oil and gas actually
obtained through recovery operations. Id. at 849-51.
7. Pursuant to its statutory obligation to prevent waste, the Commission even has the power
to limit production from all wells, regardless of which lease they are on, in order to protect the
common reserves. Corzelius v. Harrel, 186 S.W.2d 961, 967 (Tex. 1945).
8. A "horizon" is an area within a geologic formation which is sufficiently porous and
permeable to form a petroleum reservoir. Williams & Meyers, supra note 2, 497. Although the term
"field" has been used to designate a geographic region situated over a collection of oil and gas
accumulations, the definition is somewhat imprecise. See Railroad Comm'n v. Rio Grande Valley
Gas Co., 405 S.W.2d 304, 309 (Tex. 1966). The Texas courts in interpreting the Natural Resources
Code have traditionally applied the word "field" to each physically separate productive accumulation
under a single lease. E.g., Bolton v. Coats, 533 S.W.2d 914, 917 (Tex. 1975). To avoid confusion,
we will refer to oil and gas "accumulations" when not referring specifically to lenticular sand
deposits. 
9. The current version is substantially identical to the 1963 statute.
10. The Boonesville Field, like the Waskom (Cotton Valley) Field, is comprised of a series
of disconnected lenticular natural gas deposits. Gage v. Railroad Commission, 582 S.W.2d 410, 414
(Tex. 1979).
11. The Commission's rules take this into account by providing that, generally, each spacing
order must be allocated for each separate accumulation of oil or gas at a particular depth. See 16
Tex. Admin. Code § 3.37(k); see also 2 Smith & Weaver, supra note 2, § 9.4(c).
12. If we accepted Seagull's position, we would be extending Benz-Stoddard's holding to
encompass the facts of this case. Benz-Stoddard affirmed the Commission's order allowing separate
completions in three of the ten gas reservoirs underneath Benz-Stoddard's tract. This outcome was
based on an analysis of the statutory language of the Natural Resources Code. Under Benz-Stoddard,
therefore, the Commission had the authority to grant Seagull, after shutting in Well #1, the
opportunity to complete Well #4 in all three sands underneath its lease. Out of those three natural
reservoirs, Seagull has completed connections in two. Benz-Stoddard would support Seagull's
argument that it has a right to drill a separate well into the C sand if commingled production had not
been authorized and no well had yet been completed in the C sand. See 16 Tex. Admin. Code
§ 3.37(k) (2002) (stating that rule 37 exceptions for drilling permits are to be considered separately
for each accumulation in which completion could be made).


 In this case, however, Seagull characterizes Benz-Stoddard as giving it the right to produce
natural gas from every separate reservoir underneath its property. We therefore base our analysis
not on Benz-Stoddard but on the scope of the Commission's statutory authority to regulate
production.
13. In responding directly to Seagull's drilling argument, the Commission would have us
declare that it has the authority to regulate drilling in any group of disconnected gas reservoirs as if
they were a natural common reservoir. We need not answer this question because both wells have
already been drilled. Our analysis is limited to the scope of the Commission's authority to regulate
production from separate reservoirs for which a permit allowing commingled production has already
been issued.